**In the Matter of the Complaint Regarding the ANNEXATION OF A PORTION OF THE SERVICE TERRITORY OF PEO-PLE'S COOPERATIVE POWER AS-SOCIATION by the CITY OF ROCH-ESTER (NORTH PARK ADDITIONS).**

Nos. C1–90–2485, C1–90–2499.

Court of Appeals of Minnesota.

May 14, 1991.

Review Denied July 24, 1991.

R.V. Ehrick and Steven S. Fuller, O'Brien, Ehrick, Wolf, Deaner & Maus, Rochester, for relator City of Rochester.

Hubert H. Humphrey, III, Atty. Gen., and Margaret Eileen Hendriksen, Sp. Asst. Atty. Gen., St. Paul, for relator Minnesota Public Utilities Com'n.

Kenneth R. Moen, Dunlap, Finseth, Berndt & Sandberg, P.A., Rochester, for respondent People's Co-op Power Ass'n.

Hubert H. Humphrey, III, Atty. Gen. and Joan C. Peterson, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Dept. of Public Service.

Andrew J. Shea and Richard L. Evans, McGrann, Shea, Franzen, Carnival & Lamb, Minneapolis, for relator Minnesota Mun. Utilities Ass'n.

Harold P. LeVander, Jr., Maun & Simon, St. Paul, for respondent Minnesota Rural Elec. Ass'n.

Considered and decided by DAVIES, P.J., and CRIPPEN and SHORT, JJ.

## OPINION

CRIPPEN, Judge.

The City of Rochester appeals the Minnesota Public Utilities Commission's determination that it must pay compensation to a rural electric cooperative pursuant to Minn. Stat. § 216B.44 (1988). We affirm.

## FACTS

In 1987, the City of Rochester annexed two subdivisions (North Park and North Park II) covering an area previously within the electric service territory of People's Cooperative Power Association. Rochester then began extending electric service into North Park. The co-op filed a complaint with the Minnesota Public Utilities Commission seeking compensation due to a rural cooperative when part of its service territory is taken over by a municipality.

In 1974, the Minnesota legislature established service regions for electric utilities. 1974 Minn.Laws ch. 429, §§ 37–44 (codified at Minn.Stat. §§ 216B.37–.44 (1988)). Annexation by a city of any tract within another utility's assigned service area does not affect the existing utility's right to serve the area unless the municipality elects to purchase the existing utility's facilities. Minn.Stat. § 216B.41. Compensation for the existing utility's facilities is governed by Minn.Stat. § 216B.44, which provides in part:

> [W]henever a municipality which owns and operates an electric utility * * * extends its corporate boundaries through annexation * * * the municipality shall thereafter furnish electric service to these areas unless the area is *already receiving electric service* from an elec-

tric utility, in which event, the municipality may purchase the facilities of the electric utility serving the area. The municipality acquiring the facilities shall pay to the electric utility formerly serving the area the appropriate value of its properties within the area.

(Emphasis added).

The City and intervenor Minnesota Municipal Utilities Association (MMUA) contend no compensation is due because the co-op had no customers in the North Park subdivisions at the time annexation occurred. It is undisputed, however, that the co-op has made investments enabling it to serve the area. The Minnesota Rural Electric Association (MREA) intervened on behalf of the co-op.

Following a contested case hearing, the administrative law judge determined the compensation owed the co-op. Taking into account the co-op's system costs which would be recovered by sales of services in the annexed area, its costs saved by giving no service in the area, and the loss of anticipated margins in future sales of services to the North Park subdivisions, the judge determined appropriate and reasonable compensation of $136,392. The commission affirmed this decision. In addition, the commission granted an award of $11,644 for higher power acquisition costs associated with the co-op's purchase of a volume of power less than would be needed to provide services as expanded into the North Park subdivisions. The City and MMUA appeal.

## ISSUES

1. Must a municipality compensate an electric utility for the acquisition of service area even though the utility has no customers or facilities in the area?

1. The MMUA, in addition to asking that we reject the *Kandiyohi* case, also contends the case is distinguishable because it dealt with the rights of the parties before compensation was determined, rather than an actual award of compensation. In *Kandiyohi*, the MPUC enjoined Willmar from providing interim service to newly annexed territory until it negotiated acquisition of the rural electric co-op's facilities.

2. Did the Minnesota Public Utilities Commission properly compute an award of compensation for investments establishing a utility's capacity to provide future electric service in newly annexed territory?

## ANALYSIS

■ 1. When statutory interpretation is at issue, a reviewing court is not bound by an agency's determination. *In re Hibbing Taconite Co.*, 431 N.W.2d 885, 889 (Minn. App.1988). The agency interpretation is entitled to some deference where "(1) the statutory language is technical in nature, and (2) the agency's interpretation is one of longstanding application." *Id.* (citation omitted).

■ The City and MMUA ask us to reconsider and reject a 1990 decision of this court holding that an area is "receiving electric service," so that compensation is due, if the utility is "capable of providing [the area] with service." *In re Kandiyohi Cooperative Electric Power Ass'n*, 455 N.W.2d 102, 105 (Minn.App.1990), *pet. for rev. denied* (Minn. Apr. 27, 1990).

In *Kandiyohi*, the City of Willmar proposed development of services in a newly annexed area without compensation to a rural cooperative.[1] It was undisputed there were no customers in the area purchasing service at the time it was annexed by Willmar. The commission concluded that furnishing electric service in the area was synonymous with a utility assigned to the area having developed facilities making it "capable" of providing service in the area. *Kandiyohi*, 455 N.W.2d at 103–04. This court affirmed the commission and accepted its position that any alternative construction of the statute's compensation provisions would thwart planned investments by rural cooperatives. *Id.* at 105.

*Kandiyohi*, 455 N.W.2d at 104. We find no merit in the suggested distinction. *Kandiyohi* dealt squarely with the application of section 216B.44 and held that the municipality had to negotiate compensation for the acquisition before it could provide service in an area where no customers previously had been served. *Id.* at 105.

*Kandiyohi* was founded on an analysis of the language of section 216B.44. Under that section, in order for a municipality to furnish service in an area already "receiving electric service," it must purchase the "facilities" of the utility serving the area. Minn.Stat. § 216B.44. The commission is empowered to "fix and determine the appropriate value of the property within the annexed area" in the event negotiations between the parties fail. *Id.* Because the statute provides for recovery of the value of properties within the annexed area, and requires compensation only when an area is receiving electric service, the City and MMUA contend that compensation is not due when no customers are receiving service in an area annexed by the City. We concluded in *Kandiyohi*, however, that the concept of "receiving service" included the capability to provide service because of investments by the rural cooperative outside the annexed territory. *Kandiyohi*, 455 N.W.2d at 105.

We find merit in this decision and decline to depart from it. The rationale of the commission in both *Kandiyohi* and the immediate proceedings reflects a proper application of the statutory compensation provisions. The commission's interpretation encourages rural cooperatives to make investments necessary to provide power throughout their service territory. Because power plants require years of planning, utilities must be willing to make investments long before actual need. Moreover, compensation is needed to protect member customers, lenders and investors whose prior investments are rendered less usable and more expensive because of the loss of an opportunity to expand services in an annexed area.

The compensation statute governs a municipality's choice to "purchase the facilities of the electric utility serving the area." Minn.Stat. § 216B.44. Although the statute also describes the compensation requirement in terms of payment for "properties within the area," we decided in *Kandiyohi* and ratify here the conclusion that the scope of a purchase extends to facilities built to enable service in the area but not found within it. Although this sacrifices regard for the literal language on the location of purchased properties, it avoids the unreasonable result of permitting acquisition without compensation for facilities built as part of a services plan which as a matter of fact contemplates service in the area.[2] Section 216B.44 requires payment of these facility acquisition costs. Moreover, the commission view conforms to the express legislative plan, partly for encouraging facility development, to create exclusive geographic service areas in the state. Minn.Stat. § 216B.37 (1988).[3]

The City observes that the commission decision imposes a heavy cost on municipalities determined to extend municipal utility services to newly annexed territory. The City also acknowledges, however, that this cost is appropriate where a rural cooperative already serves customers in the annexed area. What is material is not the City's cost, but the justness of compensa-

---

2. While critical of compromising the literal statutory language, the dissenting opinion only states an alternative factual analysis to govern payment for facilities not literally "within" the service area. This analysis also rejects a literal construction of the statute. The dissent suggests that not all facilities considered here by the commission were duly "stranded" by the loss of the annexed service area. In fact, major facility construction by the co-op bordered the annexed area. More importantly, the commission measured compensation due by focusing on whether investments of the rural co-op were made in anticipation of furnishing services in this area; it then examined the adverse effect on these investments by taking the area from the co-op's service territory. Commission findings on the scope of plans by the co-op in constructing facilities were supported by substantial evidence, and we are neither permitted nor able to devise a useable alternative identification of facilities to be considered in the commission's task of determining the proper acquisition cost.

3. The statute declares in full:

It is hereby declared to be in the public interest that, in order to encourage the development of coordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public, the state of Minnesota shall be divided into geographic service areas within which a specified electric utility shall provide electric service to customers on an exclusive basis.

tion awarded to the rural cooperative. Should a cooperative such as respondent be given no compensation, it suffers a waste of investments. Moreover, as the commission contends, a bright line rule prohibiting compensation where no customers are found invites gerrymandered annexation which that is designed to avoid costs and may cause a severe loss of rural cooperative investments.[4]

2. The MMUA contends that even if compensation is due to the co-op, the commission erroneously calculated the amount of the award. This court may reverse factual determinations of an administrative agency if they are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

Minn.Stat. § 14.69 (1988) (scope of judicial review).

In determining the amount of compensation for an electric utility's facilities, the commission

shall consider the original cost of the property, less depreciation, loss of revenue to the utility formerly serving the area, expenses resulting from integration of facilities, and other appropriate factors.

Minn.Stat. § 216B.44 (1988).

■ The MMUA first challenges the use of "loss of revenues" in calculating compensation, arguing that there can be no lost revenues where there are no present customers. In 1988, an administrative law

judge denied the City's motion for summary judgment and determined that compensation should take into account none of the specific factors mentioned in the statute, but only "other appropriate factors." The commission affirmed the denial of summary judgment, but specifically stated in its order that the parties should present evidence on all four statutory compensation factors. The commission calculated final compensation to the co-op of $136,392 by employing a valuation method taking into account loss of future revenues.

We find no error in the MPUC's consideration of the "loss of revenues" compensation factor. Initially, we observe that any appropriate consideration of revenue losses will look to future expectations, not past revenues only. In addition, nothing in the rationale of the compensation statute precludes factfinding using loss of anticipated future revenues as a tool to determine waste of investments outside the annexed territory caused by the loss of part of the utility's service territory. The commission determined that lost revenues for services to be sold in the affected area demonstrated both (1) lost recovery of costs associated with facility development in contemplation of services in the area, and (2) margin losses that would increase the cost of services and decrease the real value of facilities for other patrons. As indicated in the discussion which follows, these findings were supported by substantial evidence.

■ The commission's findings regarding lost revenues demonstrated use of the so-called "expense residual" method to determine damages. The MMUA contends the employment of this method was error. Neither the City nor the MMUA offered evidence in the case on the amount of compensation. The MREA offered testimony

---

**4.** Relators have argued extensively on the basis of decisions in other jurisdictions. Our review of these cases indicates many of them involve provision for transfer of service areas without compensation guarantees such as the one contained in the Minnesota statute. *See e.g., Appleton Waterworks Co. v. Railroad Comm'n,* 154 Wis. 121, 136–38, 142 N.W. 476, 480–81 (1913) (no compensation for loss of service territory under Wisconsin statutory scheme). Others

lend support for the commission position that compensation for facilities includes loss of value to facilities outside the transferred area. *See e.g., Indiana & Michigan Elec. Co. v. Whitley County Rural Elec. Membership Corp.,* 160 Ind. App. 446, 453, 312 N.E.2d 503, 508 (1974) (utility entitled to compensation if property outside the annexed territory is rendered less valuable by the loss of the annexed territory).

of Dennis Eicher, and compensation as calculated by Eicher was approved by the judge and the commission. Eicher employed the expense residual method, which attributes a portion of system-wide expenses of the utility to the service area it has lost, and subtracts from that figure the cost savings connected with not having to provide services to that area.[5]

This method did not give the rural cooperative an award based on the value of its franchise, but rather compensated it for the investment or expense loss attributable to the loss in its service jurisdiction. Also, the expense residual method permitted recovery for loss of real investment value attributable to a smaller customer base. The MMUA argues that the Department of Public Services offered an alternative means to calculate compensation that would have been preferable. The judge noted, however, that this expert's compensation approach neglected to consider major distribution circuits and other system-wide facilities which were sized to serve future customers, including those in the annexed area, and which will suffer a diminished value with the loss of the North Park service territory.

■ The City also contends the record does not include proof that the investments of the rural cooperative were made specifically to fulfill a plan for services in the North Park subdivision. The judge and commission had before them evidence as to the time and nature of prior investments of the cooperative and planning decisions of the cooperative from time to time. These matters were also considered by the expert witness who testified on system-wide expenses of the cooperative. The evidence was substantial enough to permit the conclusions of the judge and commission that investments were made to permit services expected to be sold in the North Park subdivisions. The MMUA further alleges that

the expense residual formula omitted capital investments needed to provide services in the area. To the contrary, the evidence utilized by the commission and the judge took into account the amortized cost of providing service in the area.

■ Finally, MMUA questions the sufficiency of evidence for commission findings that loss of service territory will increase the co-op's costs for acquiring power from its provider. $11,644 was awarded as compensation for these costs. Although it is speculative to say when and in what form the higher costs will be suffered, the evidence permits a finding that inevitably the provider will have higher per unit costs because it sells fewer units of power, and that this experience will be reflected in higher distribution prices.

### DECISION

The commission did nor err in determining that compensation may be due to a rural electric cooperative even where there are no customers in the annexed territory. Moreover, the commission properly compensated the co-op for investments made in anticipation of providing service in the North Park subdivisions.

Affirmed.

DAVIES, Judge (dissenting).

I respectfully dissent.

This case presents a problem of statutory interpretation. At issue is the meaning of Minn.Stat. § 216B.44 (1986) which concerns the right of municipal electric utilities to extend service to areas annexed to the city. That section found its way into Minnesota statutes in 1974 as part of a bill for utility regulation put together by the invester-owned utilities, the Rural Electric Associations (REAs), and the League of

---

5. This method was used by the commission in the another case, *In Re Application of the City of Olivia to Extend Its Municipal Electric Service Area into an Area Served by Renville–Sibley Cooperative Power Ass'n*, Docket No. E–288, 136/SA–85–93 (June 27, 1986), but has not been reviewed in an appellate decision. In condem-

nation proceedings, the Minnesota Supreme Court has affirmed proof of damage in the form of value anticipated upon completion of a building project less the remaining cost of completing the work. *State v. LaBarre*, 255 Minn. 309, 316, 96 N.W.2d 642, 647 (1959).

Minnesota Municipalities.[1] Each interest endorsed the bill's adoption by the legislature.[2] The League of Minnesota Municipalities dominated the shaping of the bill and its presentation to the legislature.[3]

Section 216B.44 is the municipal utilities portion of that monumental bargain.[4] What the majority does today is take away from the municipal utilities that which was fairly won in inter-utility negotiation and in the legislative arena.

*Standard of Review*

In this case we review a decision by the Minnesota Public Utilities Commission (MPUC). Minn.Stat. § 14.69 (1988) provides for such review. It reads:

> In a judicial review under sections 14.63 to 14.68, the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
>
> \* \* \* \* \* \*
>
> (d) Affected by other error of law; or
>
> \* \* \* \* \* \*
>
> (f) Arbitrary or capricious.

The MPUC's decision here is inconsistent with section 216B.44 and is thus "affected by other error of law." We are free under section 14.69 to reverse or modify the erroneous agency decision. There is no need for deference to the agency when the issue is one of statutory interpretation. *Arvig Tel. Co. v. Northwestern Bell Tel. Co.*, 270 N.W.2d 111, 114 (Minn.1978).

### I.

One objective of the Public Utilities Act of 1974, the purpose relevant here, was to

---

1. The minutes of the meeting of the Minnesota Senate Labor and Commerce Committee for February 21, 1974, include this notation:

   Gordon Gerling—representing the United Power Association. Mr. Gerling said \* \* \* the legislature indicated to the public utilities that they were in disagreement and should reach a substantial agreement and then present a bill to the legislature for consideration. Mr. Gerling said they [the utilities] have worked many many hours in an attempt to fulfill this request and the bill being considered by this committee is the result of their long hours of research and work. His association is in substantial, not complete, agreement with the proposed legislation and support it.

2. Legislative records indicate the two main segments of the electrical power industry, the invester-owned utilities and the REAs, supported the bill. The minutes of the meeting of the Minnesota Senate Labor and Commerce Committee for February 21, 1974, include these notations:

   Harold LeVander, Jr., Attorney for the Minnesota Association of Electric Co-ops. This association, representing 52 electric co-ops in Minnesota, is in favor of the bill in its present form. Mr. LeVander said from his association's standpoint, the territorial assignment feature is the most important and the one about which they have strong and direct concern.

   Edward Spethmann—Vice-president, Northern States Power Company. \* \* \* The amended bill on the whole is workable, provides suitable regulations and Northern States Power Company supports it in its present form.

   The minutes also show that the bill was opposed by Minnesota Power and Light Company.

   Mr. Hoch spoke on two main elements of the bill to illustrate his company's objection. First, the territorial provisions which would actually freeze the service area of every utility company, thus, eliminating future competition of the industry which could be a potential liability for some consumers \* \* \*.

3. "Dean Lund, executive secretary of the League of Minnesota Municipalities, \* \* \* had a leading role in writing the bill and shepherding it through the Legislature \* \* \*." Mpls. Star, Feb. 25, 1974, at A7, col. 2.

   The minutes of the meeting of the Minnesota Senate Labor and Commerce Committee for March 15, 1973, include the following notation:

   Senator Alec Olson \* \* \* said that his bill is the League of Minnesota Municipalities bill and that a representative from that organization would review the provisions of the bill by sections.

4. The League of Minnesota Municipalities did not represent the municipal utilities directly, although it is reasonable to expect it was sensitive to the concerns of the municipal utilities. St. Clair Beeman, the lobbyist for the municipals, indicated as early as April 26, 1973, a year before passage, that they were "neutral" on the bill. At that time, it already contained the section that became section 216B.44. Minutes of the meeting of the Subcommittee on State Boards and Commissions of the Committee on Governmental Operations, Minnesota House of Representatives, April, 26, 1973.

stop buccaneering competition for retail customers among invester-owned utilities, REAs, and municipal utilities. The act carries a purpose clause which is easily understood:

> It is hereby declared to be in the public interest that, in order to encourage the development of coordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public, the state of Minnesota shall be divided into geographic service areas within which a specified electric utility shall provide electric service to customers on an exclusive basis.

Minn.Stat. § 216B.37 (1986).

The general scheme of the act was to divide the state into "geographic service areas" and to give each utility the right to provide electric service to customers in its service area "on an exclusive basis"; this would prevent criss-crossed distribution lines and other wasteful duplication of facilities. The scheme in essence was a grandfathering arrangement. Each utility was given the right to serve those areas it already served and, in the case of REAs and invester-owned utilities, an exclusive right to serve all territories extending from its existing territory halfway to its nearest nonmunicipal competitor. Minn.Stat. § 216B.39, subd. 3 (1974). The nonmunicipal competitor, in turn, was given an exclusive right to come halfway toward the first utility. The MPUC was given the right to make adjustments between and among these areas in the cases of rivers, high hills, and other natural obstacles. Minn. Stat. § 216B.39, subd. 3 (1974).

Over this basic division of the state into exclusive REA and invester-owned utility areas was placed section 216B.44, a munici-

pal utility legislative victory of some significance—*at least until today.*

Section 216B.44 commences:

> [W]henever a municipality which owns and operates an electric utility * * * extends its corporate boundaries through annexation * * * the municipality shall thereafter furnish electric service to those areas * * *.

If, in the process of extending service, the municipality runs into another utility, however, its right and obligation to provide service is qualified under this section as follows:

> [If] the [annexed] area is already receiving electric service [5] from an electric utility, * * * the municipality may purchase the facilities of the electric utility *serving the area.*

(Emphasis added.) The section continues, providing that, if the utility chooses to purchase facilities, it must pay for them:

> The municipality acquiring the facilities shall pay to the electric utility formerly serving the area the appropriate value of its *properties within the area.*

(Emphasis added.)

The section then provides for the MPUC to set the price for the acquired facilities, if there is no agreement:

> In the event the municipality and the electric utility involved are unable to agree as to the terms of the payment or exchange, the municipality or the electric utility may file an application with the commission requesting that the commission determine the appropriate terms for the exchange or sale.

Section 216B.44 continues, in two sentences providing the rules for valuation when the MPUC sets a price for the facilities "within the annexed area," as it has done in this case:

---

5. Minn.Stat. § 216B.38, subd. 3 (1986), defines electric services as follows:

> "Electric service" means electric service *furnished to a customer at retail for ultimate consumption,* but does not include wholesale electric energy furnished by an electric utility to another electric utility for resale.

(Emphasis added.) By definition, under the statute, if there are no retail customers in the annexed area, it is not possible for the area to be "already receiving electric service from an electric utility," and, if there are no customers, the buy-out obligation established by this and the next sentence of section 216B.44 do not even apply.

After notice and hearing, * * * the commission shall fix and determine the appropriate value of the *property within the annexed area*, and the transfer shall be made as directed by the commission. In making that determination the commission shall consider the original cost of the property, less depreciation, loss of revenue to the utility formerly *serving the area*, expenses resulting from integration of facilities, and other appropriate factors.

(Emphasis added.)

In this case the MPUC and the majority distort section 216B.44 by twice ignoring the phrase "property[ies] within the annexed area." [6] The MPUC also twice ignores the phrase "serving the area."

The facts here are that People's had no facilities whatsoever within the annexed 40 acres; and it did not serve one customer within its bounds. Therefore, under the explicit compensation formula of the statute, People's should receive no compensation. *See* Minn.Stat. § 645.16 (1990) ("When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall *not* be disregarded under the pretext of pursuing the spirit.") (emphasis added).

What was taken from People's was the prospective right to serve the 40 acres which now constitute the North Park additions in the city of Rochester. From 1974 on, however, any right People's had to the retail electric utility business for that area was subject to the right of the municipal utility to oust People's upon annexation. If ousted, People's had a right to be paid for its property *within the annexed area.* Unless we are to view the bare ground of the North Park additions as utility property, People's has no property there and, thus, no claim to compensation.

I suggested earlier that the 1974 act constituted an agreement within the industry. It was an agreement carefully reflected in the language enacted by the legislature. The municipal utilities did not participate equally in the allocation of rights to exclusive service territory for future development, but they insisted upon, *and obtained from the legislature*, the buy-out right upon annexation and, as a limitation upon the cost of doing so, the words "property within the annexed area" and "properties within the area."

It is not within MPUC or judicial prerogatives to undo a compromise so precisely reflected in a legislative enactment. *See Vadnais v. State Farm Mut. Auto. Ins. Co.*, 354 N.W.2d 607, 609 (Minn.App.1984) ("While the * * * argument in favor of coverage is sound and based on public policy, we are bound by the rule that *courts cannot amend statutes under the guise of construction*.") (emphasis added).

The MPUC has said its objective is "to put the displaced utility in the same position it would have occupied had the acquisition not occurred." MPUC Order Determining Compensation (July 11, 1990), p. 12. That objective is contrary to the statute if it is implemented, as it has been by the majority, by requiring the municipal utility to pay for the present value of expected future development of the annexed land. This is not an element of the carefully negotiated compromise cost formula enacted by the legislature. The MPUC decision in this case, which would require just such a payment, should be reversed as contrary to law. *See* Minn.Stat. § 14.69(d).

## II.

It is sometimes the judicial task to correct legislative oversights. The legislature itself has asked for this help. *See* Minn. Stat. § 645.17 (1990). The legislature declares in that wonderful section that it "does not intend a result that is absurd, impossible of execution, or unreasonable." *See* Minn.Stat. § 645.17 (1990). In circumstances where a literal reading of a statute leads to a result that was not contemplated by the legislature, it is legitimate for a court to make adjustments against the literal reading of the statute. This is not appropriate, however, when the allegedly "unreasonable" result was intended by the

---

**6.** And also by ignoring the section 216B.38, subd. 3 (1986), definition of "electric service."

legislature. If, however, the expression of a legislatively adopted compromise overlooks some detail that reasonably should have been reflected in the words, section 645.17 makes it legitimate for the judiciary to give a helping hand.

Perhaps this helping-hand obligation under section 645.17 justifies the decision in *In re Complaint by Kandiyohi Cooperative Elec. Power Ass'n*, 455 N.W.2d 102 (Minn.App.1990), pervasively relied on by the majority. That case blinked at the language "property within the annexed area," referred to in part I of this opinion, but the court there stated a respectable rationale for doing so. In *Kandiyohi* this court was faced with a situation where a utility had installed facilities—poles and lines, but no transformers or substations—close by a municipality, only to have their usefulness taken away by a municipal annexation of the area the facilities were intended to serve. 455 N.W.2d at 103–04. The concern was a utility investment that might be "stranded" (left without further usefulness). *Id.* at 105. The *Kandiyohi* court cited with approval the MPUC's reasoning:

> [T]he "actual customer" test proposed by the City is unreasonable. Such a test would allow a utility to make substantial investments to meet the identifiable future needs of its service area, only to have that investment *stranded* by a municipality's eleventh hour decision to annex and assert its right to provide electric service to an area the utility had arranged to serve.

*Id.* (emphasis added). "Bordering"[7] and "stranded" facilities can be treated as *constructively* within the annexed area. The *Kandiyohi* decision is thus defensible. Such an interpretation might be viewed as implementing that part of the 1974 legislative bargain that contemplated fair compensation for wasted investment. Today, however, the "stranded" facilities are a percentage of all equipment throughout the entire People's system. That is absurd.

This speculative analysis violates, rather than serves, legislative intent.

The majority relies on *Kandiyohi* as the foundation for its decision here. To do so, however, the majority must ignore both the critical facts and the rationale of *Kandiyohi*. The facts were that compensation was paid only for bordering (not even nearby) utility property; and the rationale was to compensate for "stranded" property.

I would not be offended by a decision that identified selected substations or poles or transformers as having been "stranded". There is in this record, however, no finding that there exists any pole, transformer, or substation for which compensation appropriately should be made because (1) it is deprived of usefulness and (2) it can be considered property constructively "within the annexed area." Further, no specific piece of utility property provides the measure of damage, as is proposed in *Kandiyohi*.

### III.

Governance in a city with a municipal utility is complicated by the relationship between local property tax income and the financial returns from and burden of its municipal power utility. One of the reasons, certainly, that the legislature permitted municipalities to extend service to annexed areas was to permit it to keep all residents on an equal basis as both taxpayers and utility customers. Were a portion of the community to be left out of the benefit—or burden—of local power rates, political problems concerning rate setting and investment decisions could result. These are problems the legislative buy-out authority was designed to avoid.

If cities are to be free to extend service to annexed areas, however, the cost of doing so must be reasonable, not punitive. Here the price of adding the North Park additions is not offset by the value of any "facilities" acquired "within the area." The price approved by the majority is punitive. From now on cities will perceive the price of extending service to be potentially

---

7. The facilities involved in *Kandiyohi* bordered the annexation. "Kandiyohi did have electric facilities bordering the area." *Kandiyohi,* 455 N.W.2d at 103.

punitive. They, therefore, will be tempted to leave new portions of their city unserved by the municipal utility. The consequence, then, is a divided community and a potentially unhealthy political climate. We should, instead, assure that the price set for acquired facilities provides fair value, and no more. Here, Rochester is required to pay $148,037 and receives nothing in return, except a bare land addition to its service area.

### IV.

The MPUC knows how to do it right. Deciding *In the Matter of the Application of the City of Olivia to Extend Its Municipal Electric Service Area into an Area Served by Renville–Sibley Cooperative Power Association*, Docket No. E–288, 136/SA–85–93, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER SETTING COMPENSATION FOR SERVICE EXTENSION (June 27, 1986), pp. 4 & 14,[8] the MPUC, to determine the value of acquired facilities "within the annexed area," used the stream of revenue only from the customers the REA had been serving in the area prior to the annexation. That REA revenue stream was protected for a period of ten years. This gave the REA an appropriate return on the investment it had made in poles, transformers, and substations to serve the annexed area and which were located within it. In *Olivia* the MPUC denied any award for revenue from customers who came to the area after the annexation. Such customers had never been "served" by facilities acquired by the annexing city. As to this issue, the MPUC did it right in *Olivia;* it should not now be permitted to do it wrong.

### V.

The majority suggests the MPUC did not here make an award for the value of the right to serve bare land. First, I think the commission should be taken at its word. Its order refers 30 times to "loss of revenue" and the award states, in what I take to be its operative provision:

> Proper application of the compensation formula results in compensation of $136,393 for lost *revenue* and compensation of $11,644 for increased wholesale power costs, for a total compensation award of $148,037.

MPUC Order Determining Compensation (July 11, 1990), p. 17 (emphasis added). The only revenue People's had ever acquired from the North Park area was revenue in the minds' eye of its executives as they looked at maps showing that area within its service area from 1974 on. Any award to compensate for lost revenue must have been for future revenue anticipated from that bare land; there was no other revenue to consider. Further, the award, as calculated by People's expert and the MPUC, started with a calculation of estimated future "revenue." Notwithstanding what the majority says, I find no revenue source upon which the commission's award can be based other than revenue which was only dreamed of prior to annexation.

### VI.

The MPUC has used a highly complex formula for calculating damages. It requires economists and mathematicians and guesses and assumptions. The legislature intended a buy-out by municipal utilities based on property value, measured by standard criteria like

> original cost of the property, less depreciation, loss of revenue to the utility formerly serving the area, expenses resulting from integration of facilities, and other appropriate factors.

Minn.Stat. § 216B.44. This is a classic and reasonably simple basis for determining the value of specific pieces of property. The specific property to be valued was that "within the annexed area." In this provision, too, the legislature made clear its intention that the price of municipal buy-outs of REAs and invester-owned utilities should not include complex consideration of any revenue streams except those that cast

---

**8.** See also *In the Matter of the Application of the City of Olivia to Extend Its Municipal Electric Service Area into an Area Served by Renville-* *Sibley Cooperative Power Association,* Docket No. E–288, 136/SA–85–93, ORDER AFTER REHEARING (OCT. 1, 1986), p. 10.

light on the "appropriate value of the property within the annexed area."

The MPUC, by its decision here, unreasonably complicates the administration of the law.

### VII.

Appellants appropriately assert:

If the MPUC's interpretation stands, the municipal preference granted by § 126B.44 is a Trojan horse and the right to expand a municipality's service area by annexation is a financial illusion.

The legislature has unambiguously stated that a municipal utility service area may follow expanding municipal borders. The only price the city is to pay is fair value for facilities taken over from the utility displaced. Here there were none. The award should be $0. The award of the MPUC should be disallowed.

In the alternative, the matter should be remanded to determine whether, under the rationale of *Kandiyohi,* any specific facilities have been "stranded" by the annexation.