In the Matter of a Petition by the CITY OF ROCHESTER, Minnesota, for an Order Establishing Petitioner's Rights to Provide Electric Service to Certain Street Lights Constructed and Owned by Petitioner and Located in the City of Rochester Adjacent to Highway 63 North, in the Service Territory of People's Cooperative Power Association, Respondent.

No. C6–91–810.

Court of Appeals of Minnesota.

Dec. 10, 1991.

Review Denied Jan. 30, 1992.

Joseph F. Chase, R.V. Ehrick, O'Brien, Ehrick, Wolf, Deaner & Maus, Rochester, for relator City of Rochester.

Hubert H. Humphrey, III, Atty. Gen., Rosellen M. Condon, Sp. Asst. Atty. Gen., St. Paul, for respondent Minn. Public Utilities Com'n.

Kenneth R. Moen, Dunlap, Finseth, Berndt & Sandberg, P.A., Rochester, for respondent People's Co-op. Power Ass'n.

Joan C. Peterson, Sp. Asst. Atty. Gen., St. Paul, for respondent Minn. Dept. of Public Service.

Andrew J. Shea, McGrann Shea Franzen Carnival Straughn & Lamb, Chartered, Minneapolis, for amicus curiae Minn. Mun. Utilities Ass'n.

Considered and decided by HUSPENI, P.J. and AMUNDSON and THOREEN *, JJ.

## OPINION

AMUNDSON, Judge.

Relator City of Rochester filed a petition with the Minnesota Public Utilities Commission (Commission), requesting the city's municipal utility be allowed to extend electric service to street lights located within respondent People's Cooperative Power Association's (Association) assigned service area. The city argued it should be allowed to provide service to the street lights pursuant to a provision within the Public Utilities Act which allows a utility to serve its "own utility property and facilities." Minn. Stat. § 216B.42, subd. 2 (1990). The city also claimed a right to serve the street lights under a theory that such service is a proper municipal function. The Commission concluded the city should not be allowed to extend electric service to the street lights located within the Associa-

---

* Retired judge of the district court, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

tion's assigned service area. We agree and affirm.

## FACTS

The Minnesota Public Utilities Act (Act) was adopted in 1974. 1974 Minn.Laws ch. 429. The Act required the establishment of assigned service areas, within which utilities would be allowed to provide electric service to customers on an exclusive basis. Pursuant to the Act's requirements, the City of Rochester's municipal utility and People's Cooperative Power Association were assigned electric service areas in and around the city.

The city's municipal utility has provided and maintained street lights in the city since the late 1800's. In December 1990, the city filed a petition with the Commission, requesting authorization to provide electric service to a new street light project involving eighty-two street lights. Fifty-two of the new street lights were located in the Association's assigned service area.

Following a hearing on the city's petition, the Commission issued findings and a decision prohibiting the city from serving the street lights located in the Association's territory. The Commission based its decision upon the assigned service area requirements in the Public Utilities Act.

The city petitioned the Commission for a rehearing and reconsideration, but the Commission denied the petition, stating the city raised no new issues, evidence, or reasons for reconsidering the Commission's original decision.

The city has obtained a writ of certiorari, seeking review of the Commission's decision.

## ISSUE

Does the Public Utilities Act prohibit the city from extending electric service to street lights located in the Association's assigned service area?

## ANALYSIS

The legislature granted electric utilities exclusive service rights within assigned service areas. Minn.Stat. § 216B.40 (1990).

The legislature has, however, provided an exception to the assigned service area requirements:

> [A]ny electric utility may extend electric lines for electric service to its own utility property and facilities.

Minn.Stat. § 216B.42, subd. 2 (1990). The city argues that the street lights should be characterized as "its own utility property and facilities."

When construing statutory language, the court's primary goal is to ascertain and effectuate the legislature's intent. Minn. Stat. § 645.16 (1990). We will consider, and often defer to, an agency's interpretation of its governing statutes. *See* Minn. Stat. § 645.16(8) (1990). We have stated:

> When agency conclusions are based on legal rather than factual considerations * * *, the reviewing court is not bound by the agency's decision and need not defer to the agency's expertise. An agency's interpretation of legislative intent, while influential, cannot bind a court. * * * Nonetheless, "[w]hen the meaning of the statute is doubtful, courts should give great weight to a construction placed upon it by the department charged with its administration."

*In re Minn. Joint Underwriting Ass'n*, 408 N.W.2d 599, 605 (Minn.App.1987) (citations omitted).

We construe the phrase "utility property and facilities" in terms of what society needs. The legislature has identified society's needs within assigned service area statutes:

> It is hereby declared to be in the public interest that, in order to encourage the development of coordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public, the state of Minnesota shall be divided into geographic service areas within which a specified electric utility shall provide electric service to customers on an exclusive basis.

Minn.Stat. § 216B.37 (1990).

Underlying these policies is the idea that the public interest does not favor competi-

tion between or duplication of electric utilities. Rather, electric utilities are "natural monopolies." *See* Hamilton & Colacci, *Economic Efficiency as the Primary Objective of State Utility Commission Policy,* 8 Wm. Mitchell L.Rev. 309, 315 (1982). One commentator has explained this concept:

> The term "natural monopoly" suggests that most utility firms operate with a markedly decreasing cost function and have decreasing costs over a wide scale of operations. * * * In the long run, economies of large scale seem available to most utilities.
>
>     \*     \*     \*     \*     \*     \*
>
> It is felt that society will be better served by a monopolistic type of organization if such an organization does indeed take advantage of these economies. This principle has long been recognized and has led to social preference for one utility in a given service area. It is further widely believed that utilities move "naturally" toward a monopolistic type of structure if allowed to operate without social controls. This tendency has been recognized in the literature of economics for more than a century, although some object to the use of the term "natural" to characterize this type of market structure.
>
> Controlled entry and operation only by permission of some agency of government are grounded in the concept that duplication of the large capital undertakings of utilities is socially wasteful and that competition among utility firms, which of necessity must use the public streets, is unduly disruptive. Under these circumstances it is logical to limit service to a single seller and thus avoid waste and disruption. Thus, local monopoly has become the predominant form of market structure.

M. Farris & R. Sampson, *Public Utilities: Regulation, Management, and Ownership* 156 (1973) (footnotes omitted).

Once it is recognized that electric utilities are natural monopolies, it follows that we must closely examine any alleged exceptions to exclusive service territory rights. In examining the exception to exclusive

service rights for a utility's own "utility property and facilities," the Commission focused on the "utility" function. We agree that the function, rather than the ownership, of property or facilities is critical.

We also agree with the Commission's characterization of the utility function as that which is necessary for supplying electric power. *See* Minn.Stat. §§ 216B.02, subd. 4, 216B.38, subd. 5 (1990), (defining "electric utility" and "public utility" as entities operating, maintaining or controlling equipment or facilities used to furnish electric service). Thus, utility property and facilities would include, for example, power plants, substations, corporate headquarters, etc. Under this analysis, street lights do not serve a "utility" function.

The city argues that it must be allowed to provide street lighting as a "municipal" function. Again, however, the Commission properly focused on the function of the service, rather than the fact of municipal ownership. Although electric service to street lights may be furnished by a municipal utility, that does not make the service "municipal" in nature.

The city points out that Minn.Stat. § 455.01 (1990) authorizes municipalities to construct and operate electric light plants for "municipal purposes." The city notes that prior to 1976, this statute included street lights within a listing of "municipal purposes."

As the Commission explained, Minn.Stat. § 455.01 was enacted due to the recognition in the early 1900's that the public benefit of street lighting was sufficient to "justify" a municipality's acquisition or construction of its own electric plant. In the early 1900's, there was a trend in this country towards municipal ownership of electric utilities due, in part, to the fact that private electric services were not yet prevalent. As a result, "[m]any communities were faced with a practical choice between public ownership or no electricity." M. Farris & R. Sampson, *Public Utilities* at 270.

The availability of electric service was no longer a problem in 1974 as evidenced by the assigned service area statutes themselves. The 1974 legislature, apparently

foreseeing a potential conflict between the new Public Utilities Act (including the assigned service area provisions) and prior legislation, stated that "[a]ll acts and parts of acts in conflict with [the Public Utilities Act] are repealed insofar as they pertain to the regulation of public utilities." Minn. Stat. § 216B.66 (1990). Accordingly, the city's alleged right to serve the street lights, based upon Minn.Stat. § 455.01, has been countermanded by the assigned service area statutes.

The assigned service area statutes generally prohibit an electric utility from providing electric service "at retail" to "customers" within the assigned area of another electric utility. Minn.Stat. § 216B.40; *See also* Minn.Stat. § 216B.38, subd. 3 (1990) (defining "electric service" as service furnished to a customer at retail). The city argues that when extending service to street lights, there is no service to a "customer at retail." [1] According to the city, by furnishing electric service to its own street lights, it would actually be furnishing a municipal service to itself. Again, we caution that function, not ownership, is paramount. The function itself remains private and proprietary, although the utility—whether municipal or non-municipal—must necessarily operate in the public sector and serve society.

The city observes that other entities may produce power for their own consumption; for example, the Mayo Clinic generates its own electricity. Similarly, the city argues, it should be allowed to provide service to its own street lights. The critical distinction here is the city's attempt to violate established service area assignments.

One of the purposes of the assigned area statutes is to provide "economical * * * electric service to the public." Minn.Stat. § 216B.37 (1990). The city argues it should have the option to decide whether it would be economically efficient for the municipal utility to extend service to the street lights. This option, however, has been abrogated by the assigned service area statutes. By opting to serve the street lights, the city would necessarily duplicate power lines in the Association's territory, violating another important purpose of the assigned service areas: to "eliminate or avoid unnecessary duplication of electric utility facilities." *Id.*

Regardless of the economics of a particular situation, the legislature has determined that, overall, it is economically more desirable to allow exclusive (i.e. monopoly) service within assigned areas. As the Commission recognized: "Over time, every utility's rates will vary in relation to those of other utilities." Economic considerations of a specific situation are therefore irrelevant when determining service rights.

As the Commission also noted, case-by-case determinations based upon economic considerations would lead to uncertainty in long-range planning by utilities. In several prior decisions, we have stressed the importance of long-range planning by utilities. *See, e.g., In re Annexation of a Portion of People's Coop. Power Ass'n*, 470 N.W.2d 525, 528 (Minn.App.1991) ("Because power plants require years of planning, utilities must be willing to make investments long before actual need"), *pet. for rev. denied* (Minn. July 24, 1991); *In re Kandiyohi Coop. Elec. Power Ass'n*, 455 N.W.2d 102, 105 (Minn.App.1990) (Phrase "receiving electric service" should be construed to encompass situations where utility has the right to serve present and future customers; any other interpretation would thwart planned investments by existing utility for anticipated service to the area); *City of Willmar Mun. Utils. Comm'n. v. Kandiyohi Coop. Elec. Power Ass'n*, 452 N.W.2d 699, 703 (Minn.App.1990) (determination whether area has been previously receiving electric service requires consideration of long range planning by utilities regarding service within their assigned service areas), *pet. for rev. denied* (Minn. Apr. 27, 1990).

The city argues that street lights are entered on the city's books for accounting purposes as "electric plant in service," rather than "nonutility property," and therefore must be considered utility proper-

---

1. We have previously stated that the term "retail" was intended by the legislature to differentiate from "wholesale" transactions. *In re*

*Kandiyohi Coop. Elec. Power Ass'n.,* 455 N.W.2d 102, 105 (Minn.App.1990).

ty and facilities. The city also argues its accounting system reflects "real world operations." The Commission properly rejected these arguments:

While this may be a rational internal accounting practice, that does not make street lights property or facilities used to provide retail electric service, the statutory definition of "utility." The Commission does not believe the municipal utility's understanding of its historical origins or the city's internal accounting procedures would justify disregarding the clear language of the statute.

Finally, the city cites case law from other jurisdictions, including *North Ga. Elec. Membership Corp. v. City of Calhoun*, 195 Ga.App. 382, 393 S.E.2d 510 (1990) and *Marshall County Rural Elec. Coop. v. Ames Mun. Elec. Sys.*, 71 PUR4th 217 (Iowa Commerce Comm'n, Dec. 25, 1985). The cited cases, based upon different statutory language and definitions, are distinguishable, and are not controlling here.

### DECISION

Principles of statutory construction and considerations of public policy support the Commission's conclusion that the city's municipal utility is prohibited from extending electric service to street lights in the Association's service territory.

Affirmed.