In the Matter of the APPLICATION BY THE CITY OF ROCHESTER FOR AN ADJUSTMENT OF ITS SERVICE AREA BOUNDARIES WITH PEOPLE'S COOPERATIVE POWER ASSOCIATION, INC.

No. C9–96–1002.

Court of Appeals of Minnesota.

Dec. 24, 1996.

Review Denied Feb. 26, 1997.

Kenneth R. Moen, Dunlap & Seeger, P.A., Rochester, for relator People's Cooperative Power Association, Inc.

Joseph F. Chase, O'Brien, Ehrick, Wolf, Deaner & Maus, L.L.P., Rochester, for respondent City of Rochester.

Hubert H. Humphrey III, Attorney General, Margie E. Hendriksen, Assistant Attorney General, St. Paul, for respondent Minnesota Public Utilities Commission.

Hubert H. Humphrey III, Attorney General, Brent Vanderlinden, Assistant Attorney General, St. Paul, for respondent Minnesota Department of Public Service.

Considered and decided by CRIPPEN, P.J., TOUSSAINT, C.J., and WILLIS, J.

## OPINION

WILLIS, Judge.

The Minnesota Public Utilities Commission (MPUC) determined the value of certain

electric service areas that respondent City of Rochester sought to acquire from People's Cooperative Power Association (People's). People's claims that the MPUC erred by failing to evaluate all of its projected expenses and revenue losses. The City filed a notice of review, claiming that the areas were not receiving electric service from People's. We affirm.

## FACTS

The Minnesota Public Utilities Act requires that electric utilities operate in assigned service areas. Minn.Stat. § 216B.40 (1996). A municipality that owns an electric utility may acquire another utility's service areas upon municipal annexation of the areas. Minn.Stat. § 216B.44 (1996).

The City of Rochester (City) owns a municipal electric system, which provides service to City residents. People's is a rural electric cooperative, which provides service to areas outside the City.

In May 1993, the City petitioned the MPUC to determine the amount of compensation owed to People's for certain of its assigned service areas that the City had recently annexed. See Minn.Stat. § 216B.44 (stating that after notice and hearing, MPUC shall determine appropriate terms for transfer of service rights in an annexed area).

An Administrative Law Judge (ALJ) conducted a hearing and submitted a recommended order to the MPUC. The MPUC issued an order and an order after reconsideration, adopting some of the ALJ's recommendations and rejecting or modifying others. The MPUC found that the annexed areas were receiving electric service from People's. The MPUC determined the compensation owed to People's, including an award of compensation for the revenue losses that People's would be expected to incur over a ten-year period. The MPUC denied compensation for projected increases in the wholesale rates People's will pay as a result of the transfer of service rights.

## ISSUES

1. Did the MPUC err by finding that the annexed areas were receiving electric service from People's?

2. Did the MPUC err by limiting its calculation of People's' revenue losses to a ten-year period?

3. Did the MPUC err when determining the effective date of the ten-year period?

4. Did the MPUC err by denying compensation for projected increases in the wholesale rates People's will pay?

## ANALYSIS

■■■ When the MPUC issues a decision that is legislative in nature, balancing public policies and private needs and making choices among public policy alternatives, we will affirm, unless we are presented with clear and convincing evidence that the decision exceeds the MPUC's statutory authority or is unjust, unreasonable, or discriminatory. *St. Paul Area Chamber of Commerce v. Minnesota Pub. Serv. Comm'n,* 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977). We review the MPUC's factual findings to determine whether they are supported by substantial evidence in the record. *Id.* at 259–60, 251 N.W.2d at 356.

### 1. "Receiving electric service."

■■ A municipality must compensate an electric utility for an acquired service area only if the area is "already receiving electric service" from the utility. See Minn.Stat. § 216B.44 (authorizing municipality to acquire and pay for annexed service areas where areas are "already receiving electric service from an electric utility"). The City argues that it need not compensate People's for its service rights in the annexed areas because those areas were not already receiving electric service from People's. The City points out that People's had only 46 existing customers in the annexed areas and that only eight of the 25 annexed areas had existing electric service.

We addressed a similar argument in *In re Complaint by Kandiyohi Co-op. Elec. Power Ass'n against Willmar Mun. Utils. Comm'n,* 455 N.W.2d 102 (Minn.App.1990). There we affirmed the MPUC's decision that an annexed area was receiving electric service, even though there were not yet any custom-

ers in the area, because the rural utility "ha[d] facilities in place capable of providing [the area] with service." *Id.* at 105. We noted that the Public Utilities Act provides electric utilities with the right to provide "electric service" to "each and every present *and future* customer in its assigned service area." *Id.* (quoting Minn.Stat. § 216B.40) (emphasis supplied by *Kandiyohi* court). We also recognized that a requirement of actual service to existing customers in an annexed area "would thwart planned investments by the existing utility for anticipated service to the area." *Id.*

■ We reaffirmed the *Kandiyohi* decision in *North Park*, where a rural utility had no customers in the annexed area, but had made investments enabling it to serve the area. *In re the Complaint Regarding the Annexation of a Portion of the Service Territory of People's Cooperative Power Ass'n by the City of Rochester, (North Park Additions),* 470 N.W.2d 525, 528 (Minn.App.1991), *review denied* (Minn. July 24, 1991) [hereinafter *North Park* ]. We decline to overrule our decisions in *Kandiyohi* and *North Park.*

The City argues that in *Kandiyohi* and *North Park*, the existing utilities were capable of providing service to the area, whereas People's does not have in place adequate facilities to serve the annexed areas for ten years. But the fact that People's would have had to make additional investments in the future to serve additional customers does not address the question whether People's currently had facilities in place capable of serving the areas. People's was already serving customers in the areas and planned to invest in facilities to be able to continue to serve existing and future customers.

### 2. Ten-year compensation period.

■ When determining compensation for an electric utility's loss of service rights in an annexed area, the MPUC must consider the utility's expected revenue losses. Minn.Stat. § 216B.44. People's submitted evidence that it would suffer revenue losses for an unlimited time period following the City's acquisition of its service areas. People's asked the MPUC to order the City to compensate it indefinitely for those projected revenue losses.

■ The MPUC rejected People's' request, considering only those revenue losses that People's would be expected to incur within a ten-year period. The MPUC noted that a utility does not have permanent rights to its service areas. *See* Minn.Stat. § 216B.44 (authorizing municipal acquisition of service areas). The MPUC concluded that compensation for an unlimited time period for lost revenues would be inconsistent with the nature of service area rights, a utility's duty to adjust to new realities, and the determination of non-speculative compensation awards. We defer to these legislative policy decisions, which are not in excess of statutory authority, unjust, unreasonable, or discriminatory. *See St. Paul Area Chamber of Commerce,* 312 Minn. at 262, 251 N.W.2d at 358.

The MPUC's decision that People's' expected revenue losses should be limited to a ten-year period was based on the MPUC's experience in studying and deciding issues related to the assignment and re-assignment of electric utility service areas. Moreover, the MPUC's decision is supported by the evidence and the MPUC's analysis of that evidence.

The MPUC concluded that within ten years, People's will be able to mitigate any losses resulting from the City's acquisition of People's' service areas. Capacity that otherwise would have been dedicated to the annexed areas will now be available for the expected growth in People's' remaining service areas around the City. The evidence indicated that People's would have had to invest in new facilities, equipment, and personnel to provide future service to the annexed areas. People's may now adjust its revenues and expenses in its remaining service areas, without further investment in new facilities.

The MPUC pointed out that ten years is a standard planning horizon used by People's and other rural electric cooperatives and that electric cooperatives prepare or revise long-range plans approximately every ten years. The MPUC noted that it had found a ten-

year period reasonable in two prior cases[1] and that People's has never before requested compensation for an unlimited time period for expected revenue losses.[2] The MPUC found that People's is beginning a new ten-year, long-range planning period, which suggests that plans for mitigation at this point will not be difficult.

People's cites evidence that the useful life of utility property is generally longer than ten years.[3] But People's' expert witness did not calculate the remaining useful life of the facilities involved here. In fact, there was evidence that some of People's' property is quite old.

The MPUC believed that after ten years, it would be too speculative to determine which, if any, revenue losses should be attributed to the City's acquisition of People's' service areas. This belief is supported by testimony that the entire utility industry is expected to change and that the changes will probably affect electric consumption in the annexed areas.[4]

People's argues that the establishment of an unlimited compensation period would not require undue speculation regarding future revenues and expenses. People's notes that in *North Park*, this court affirmed a decision by the MPUC where evidence of increased costs was speculative. 470 N.W.2d at 530. The facts in *North Park* were different from those in the present case. More importantly, in *North Park*, as here, we were deferring to a legislative policy decision by the MPUC.

### 3. Commencement of ten-year period.

▇ Upon the commencement of these proceedings, the MPUC issued an interim service order, which authorized the City to begin providing service to 14 of the annexed areas. In its order after reconsideration, the MPUC decided that the ten-year compensation period for lost revenues in those 14 areas should begin when the interim service order was issued. For the remaining annexed areas, the MPUC decided that the ten-year period should begin at the time service rights are transferred. People's claims that for the 14 areas subject to the interim service order the ten-year period should also begin at the time service rights are transferred. The MPUC disagreed, explaining:

[A]n interim service Order * * * gives the assigned utility the notice it needs to begin an orderly transition from serving the area to not serving the area.

From the date of the interim service Order, the assigned utility is no longer responsible for serving new customers. From that date, it can factor its changed responsibilities into its long term and intermediate planning process. * * *

* * *

[T]he Commission granted the City interim service rights only after finding " * * * it is virtually certain the City will acquire permanent service rights to these areas . . ." Nothing has occurred since then to change this judgment. The Commission concludes the possibility that the City will renege is far too remote to justify awarding compensation beyond the ten-year pe-

---

1. *In re the Application of the City of Olivia to Extend its Municipal Electric Service Area into an Area Served by Renville–Sibley Cooperative Power Ass'n,* Docket No. E288, 136/SA–85–93 (June 27, 1986) and *In re the Complaint Regarding the Annexation of a Portion of the Service Territory of People's Cooperative Power Ass'n by the City of Rochester (North Park Additions),* Docket No. E–132, 299/SA–88–270, 1990 WL 600919 (July 11, 1990).

2. People's argues that in prior cases it focused on different issues as a matter of strategic judgment. There was testimony, however, that in those cases, ten years was considered to be a reasonable compromise in approximating a planning horizon.

3. This evidence may more appropriately address another statutory factor, original cost of property less depreciation, rather than the loss-of-revenue factor. *See* Minn.Stat. § 216B.44.

4. Expected changes include continued advances in energy conservation, potential retail wheeling, and the development of customer-owned generation equipment, such as fuel cells, solar cells, and wind generation. The evidence suggested that as a result of these potential changes, electric utilities like People's will be subjected to significant competitive pressures and will, accordingly, reduce costs, defer projected expenditures, and lower operating margins in order to keep rates down.

riod necessary for People's to assess and respond to the changed circumstances resulting from the acquisition.

(Emphasis omitted.)

People's has not provided this court with clear and convincing evidence that the MPUC's decision was unjust or unreasonable, in light of the MPUC's expertise and the explanations for its decision. People's does not argue that the MPUC's legislative decision was discriminatory or in excess of statutory authority. *See St. Paul Area Chamber of Commerce*, 312 Minn. at 262, 251 N.W.2d at 358.

### 4. Wholesale rate increases.

◼ People's argues that, due to the loss of its service areas, it will purchase less wholesale power from its supplier, Dairyland Power Cooperative, which will result in a loss of revenue to Dairyland. As a result, People's argues, Dairyland will increase its wholesale rates. People's claims that the MPUC erred by refusing to evaluate this expected increase in People's' wholesale rates when determining the compensation owed by the City. *See* Minn.Stat. § 216B.44 (stating that MPUC must consider "other appropriate factors," when determining the value of acquired service areas).

People's points to *North Park*, where we affirmed the MPUC's award of compensation to People's for an expected increase in the wholesale rates it would pay following a taking of its service areas. 470 N.W.2d at 530. Here, however, the MPUC specifically found that "People's will not face increased wholesale rates as a result of losing the transferred areas." The MPUC found that the loss of current customers in the annexed areas would have a minimal impact on Dairyland because those customers represented "an infinitesimal part of Dairyland's total load." The MPUC found that Dairyland will be able to sell on the wholesale market any minimal excess capacity resulting from the loss of customers in the annexed areas.

The MPUC noted that at the time of the *North Park* decision, Dairyland had an abundant capacity of wholesale power, whereas now, Dairyland lacks abundant capacity. The MPUC found that to provide wholesale

power for the acquired areas over the next ten years, Dairyland would have had to add generating capacity.

There is substantial evidence in the record supporting the MPUC's findings. *See St. Paul Area Chamber of Commerce*, 312 Minn. at 259–60, 251 N.W.2d at 356 (stating substantial evidence test upon review of MPUC's factual findings). The evidence indicates that Dairyland retired one of its facilities in 1993, that it intended to retire smaller coal-fired units by the year 2000, and that its excess capacity after that time would be minimal. There was evidence from at least two witnesses that Dairyland could sell excess capacity. This evidence supports the MPUC's ultimate finding that wholesale rates charged to People's will not increase as a result of its loss of the service areas.

### DECISION

The annexed areas were receiving electric service from People's, requiring that the City compensate People's for its service rights in those areas. The MPUC properly found, based on substantial evidence in the record, that wholesale rates paid by People's would not increase as a result of its loss of the service areas. We defer to the MPUC's legislative decision to limit People's' revenue losses to a ten-year period.

**Affirmed.**