In the Matter of the Application of the **GRAND RAPIDS PUBLIC UTILITIES COMMISSION** to extend its Assigned Service Area into the Area Presently Served by Lake Country Power.

No. A05–2550.

Court of Appeals of Minnesota.

May 29, 2007.

Andrew J. Shea, Kathleen M. Brennan, McGrann, Shea, Anderson, Carnival, Straughn & Lamb, Minneapolis, MN, for relator Grand Rapids Public Utilities Commission.

Lori Swanson, Attorney General, Kari Valley Zipko, Assistant Attorney General, St. Paul, MN, for respondent Public Utilities Commission.

Harold P. LeVander, Jr., Felhaber, Larson, Fenlon & Vogt, P.A., St. Paul, MN, for respondent Lake Country Power.

Considered and decided by DIETZEN, Presiding Judge; HUDSON, Judge; and COLLINS, Judge.*

## OPINION

DIETZEN, Judge.

In this certiorari proceeding, relator challenges the amount of a compensation award ordered by the Minnesota Public Utilities Commission (Commission) pursuant to Minn.Stat. § 216B (2006) to compensate an electric utility for territory it annexed as provided by law. Relator argues that the Commission's order (1) was arbitrary and capricious and not supported by substantial evidence; and (2) was unconstitutional. We affirm.

## FACTS

The City of Grand Rapids provides electricity to the area within its municipal boundaries through the Grand Rapids Public Utilities Commission (City). The City's annual sales in kilowatt hours (kWh) is approximately 147 million kWh. Lake Country Power Cooperative Electric Association (Lake Country) provides electricity to a large area outside of municipal-utility service boundaries in eight counties in northern Minnesota. Lake Country's service area completely surrounds the City. Its annual sales are just above 600 million kWh.

In June 2003, the City filed a petition with the Minnesota Public Utilities Commission (Commission) under Minn.Stat. § 216B.44 (2002), exercising its right to extend its assigned service area to include two areas recently annexed to the city but located within the assigned service area of Lake Country. The petition asked the Commission to adjust the City's service-area boundaries to include these areas and

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

to schedule a contested-case proceeding to determine appropriate compensation to Lake Country as required by the statute.[1] In making a determination of the appropriate compensation, Minn.Stat. § 216B.44(b) requires the Commission to consider (1) the original cost of the property, less depreciation; (2) loss of revenue to the utility formerly serving the area; (3) expenses resulting from integration of facilities; and (4) other appropriate factors.

The administrative law judge (ALJ) assigned to the case conducted a two-day evidentiary hearing in June 2004. Witnesses, including experts, were presented by the City and Lake Country. The parties reached agreement on virtually all compensation factors except lost revenue. Based on different conclusions regarding the application of the "net-revenue-loss" formula to the facts, the City advocated a total award of $204,402, or 16.5 mills/kWh, limited to existing customers, and Lake Country advocated a total award of $521,657, or 35.4 mills/kWh for present customers and 32.4 for future customers.

Following the hearing, the ALJ issued findings, conclusions, and a recommendation for a compensation award to Lake Country for lost revenue of $233,820 (unadjusted for present value), or 15.5 mills/kWh. In reaching the recommendation the ALJ adopted the City's proposed calculation method and rejected Lake Country's proposed award. Alternatively, the ALJ recommended a compensation award of $270,850, using the gross-revenue-multiplier formula.

Lake Country filed exceptions to which the City responded, and the matter was presented to the Commission. Subsequently, the Commission filed its Order Determining Compensation, which was supported by findings and conclusions.

The Commission concluded that it would use the "net-revenue-loss" formula to calculate the "loss of revenue to the utility formerly serving the area" required by the statute, with the objective of putting the displaced utility in the same position it would have occupied but for the loss of service rights to the area for which compensation is being determined.

The "net-revenue-loss" formula was developed by the Commission in 1990, with several refinements and clarifications in subsequent cases. The formula (1) determines gross revenues for each year of the compensation period, which the Commission has set at ten years, to reflect the intermediate planning period of most utilities; (2) determines avoided costs that the utility would no longer be required to incur because it is no longer serving the area (such costs would include the purchase of power to be sold within the area); (3) subtracts the avoided cost from the gross revenues, which results in yearly net-revenue loss for each year in the ten-year compensation period; and (4) reduces net revenue losses to present value. Due to the uncertainty of future events, the lump-sum amount calculated under this method is often converted into a kilowatt-per-hour rate, or mill rate, and payment is made at this mill rate over the compensation period.

The Commission found that the primary difference between the parties in the calculations of lost revenue was how the parties calculated "avoided costs," or the costs that Lake Country would avoid by not serving the annexed areas and that would be deducted from the areas' gross revenue, to arrive at a net-revenue-loss figure. Based on its analysis, the Commission awarded Lake Country a total compensa-

1. The petition also requested the Commission to transfer to the City another portion of Lake Country's assigned service area located within the City of La Prairie, but that issue is not the subject of this appeal.

tion rate of 30 mills/kWh. The Commission rejected the ALJ's report and, with minor adjustment, adopted Lake Country's proposed compensation award. The City filed a petition for rehearing and reconsideration, which was denied. This certiorari appeal followed.

## ISSUES

1. Was the Commission's compensation award to Lake Country arbitrary, capricious, contrary to law, or unsupported by substantial evidence in the record?

2. Was the Commission's compensation award to Lake Country unconstitutional?

## ANALYSIS

### I.

■ The City argues that the Commission's order was arbitrary and capricious and not supported by substantial evidence. When reviewing agency decisions, we adhere to the fundamental concept that decisions of administrative agencies enjoy a presumption of correctness and that deference should therefore be shown by courts to the agency's expertise and its special knowledge in the field. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). The agency decision-maker is presumed to have the expertise necessary to decide technical matters within the scope of the agency's authority. *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn.2001).

### A. ALJ Report

■ Initially, the City argues that the Commission erred by rejecting the ALJ's report. The decision of the ALJ is entitled to some weight. *In re Denial of Eller Media Co.'s Applications for Outdoor Adver. Permits*, 664 N.W.2d 1, 6 (Minn.2003). But the agency decision-maker owes no particular deference to the ALJ's findings, conclusions, or recommendation. *Blue*

*Cross & Blue Shield*, 624 N.W.2d at 278. Although an agency owes no particular deference to the ALJ's report, Minn.Stat. § 14.62 (2006), requires an agency to give reasons for its rejection of the ALJ's recommendation, and failure to do so is evidence that the agency's decision was arbitrary and capricious. *Bloomquist v. Comm'r of Natural Res.*, 704 N.W.2d 184, 190 (Minn.App.2005).

■ The Commission gave several reasons for rejecting the ALJ's recommendation. First, the Commission rejected the ALJ's conclusion that Lake Country's proposed compensation award was unreasonable. Specifically, the Commission reviewed the ALJ's comparison of Lake Country's system-wide margin of 2.6% and an estimated margin of 40.4% for the annexed area and concluded that the two margins were not comparable.

Second, the Commission rejected the ALJ's comparison to previous awards and settlements in the past 13 years as compiled by the Department of Commerce. The Commission concluded that the comparison exhibit was of "dubious relevance and little probative value," because each compensation decision is unique, and utility costs and net revenue vary widely due to a variety of factors which include the characteristics of the service area and its load.

Third, the Commission rejected the ALJ's use of a gross-revenue multiplier as a valid way to determine net-revenue loss on the ground that it did not measure all of the factors required by statute. Fourth, the Commission rejected the ALJ's conclusion that comparing the City's retail mill rate to Lake Country's proposed compensation mill rate demonstrates that a lower compensation rate is appropriate. The Commission concluded that such a comparison had no bearing on the statutory factor and that the comparison did not take into

account the unique features of Lake Country's service area.

Fifth, the Commission rejected the ALJ's conclusion that avoided costs should be calculated on an allocated basis rather than incrementally. It concluded that because not all fixed costs allocated to particular customers will go away with the departing customers, fixed costs formerly borne by the departing customers must be spread incrementally over those remaining on the utility's system. Finally, the Commission rejected the ALJ's approach to determining future customers for the annexed areas.

The Commission's consideration and rejection of the ALJ's recommendation is well reasoned and based on policy considerations and value judgments. On these matters, we defer to the expertise of the agency. *Reserve Mining*, 256 N.W.2d at 824.

### B. Commission Order

 The City argues that the Commission's order was predicated on a number of errors that rendered its award to Lake Country arbitrary, capricious, and contrary to law. Review of agency decisions following a contested-case hearing is governed by Minn.Stat. § 14.69 (2006). On review, this court may reverse or modify the agency's decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inference, conclusion, or decisions are:

(a) in violation of constitutional provisions; or

(b) in excess of the statutory authority or jurisdiction of the agency; or

(c) made upon unlawful procedure; or

(d) affected by other error of law; or

(e) unsupported by substantial evidence in view of the entire record as submitted; or

(f) arbitrary or capricious.

Minn.Stat. § 14.69. Upon review, we do not substitute our judgment for that of an agency. *Blue Cross & Blue Shield*, 624 N.W.2d at 277; *Reserve Mining*, 256 N.W.2d at 825. A decision is not arbitrary and capricious if the agency, presented with opposing points of view, reaches a reasoned decision that rejects one point of view. *CUP Foods, Inc. v. City of Minneapolis*, 633 N.W.2d 557, 565 (Minn.App. 2001), *review denied* (Minn. Nov. 13, 2001). But an agency's decision is arbitrary and capricious if it reflects the agency's will and not its judgment. *Blue Cross & Blue Shield*, 624 N.W.2d at 278.

 Put differently, we will not disturb an agency's decision as long as the agency's determination is supported by substantial evidence. *Eller Media*, 664 N.W.2d at 7. The substantial-evidence test is satisfied when there is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *In re Request of Interstate Power Co. for Auth. to Change its Rates for Gas Service in Minn.*, 574 N.W.2d 408, 415 (Minn.1998) (citation omitted). When applying the substantial-evidence test we determine whether the agency adequately explained how it derived its conclusion and whether that conclusion was reasonable. *In re Petition of N. States Power Co. for Auth. to Change its Schedule of Rates for Elec. Serv. in Minn.*, 416 N.W.2d 719, 724 (Minn.1987). We retain the authority to review de novo errors of law which arise when an agency decision is based upon the meaning of words in a statute. *Eller Media*, 664 N.W.2d at 7.

#### 1. "Reasonableness" Checks

 The City argues that the Commission erred by not applying the gross-revenue-multiplier formula[2] as a "reason-

2. The gross-revenue-multiplier formula calculates revenue loss by multiplying the annual

gross revenues by a factor of two or three.

ableness" check on the net-revenue-loss formula. Minn.Stat. § 216B.44(b) provides, inter alia, that the Commission determine "appropriate" compensation under the statute to the utility formerly serving the annexed area. The language of the statute does not explicitly require that the Commission apply an alternative formula to "check" the reasonableness of the compensation award. The statute does require that the Commission consider the "original cost of the [assigned utilities'] property, less depreciation, loss of revenue to the utility formerly serving the area, expenses resulting from integration of the facilities, and other appropriate factors." Here, the Commission rejected the gross-revenue-multiplier formula on the basis that it does not calculate the statutory factors that must be applied to determine a compensation award.

The City also argues that the Commission has previously recognized the gross-revenue-multiplier formula. We disagree. The Commission acknowledged that it mentioned the formula in a 1986 case, but noted that it did not adopt the formula and "does not endorse the use of a gross revenue multiplier for proceedings of this type." The Commission reasoned that this formula does not comply with the requirement of the statute.

We observe that in future cases, it may be appropriate for the Commission to consider alternative-revenue formulas as a "reasonableness check" to its valuation determination under the statute. *See Equitable Life Assurance Soc'y of the U.S. v. County of Ramsey*, 530 N.W.2d 544, 553 (Minn.1995) (stating that whenever possible "appraisers should apply at least two approaches to market value because the alternative value indications derived can serve as useful checks on each other"). But the "net-revenue-loss" formula is an appropriate method for the Minnesota Public Utilities Commission to calculate a displaced utility's lost revenues under Minn.Stat. § 216B.44. On this record, the Commission's decision is supported by the record and is not arbitrary and capricious.

### 2. Future Customers

The City next argues that the Commission erred in awarding loss of revenue for potential future customers. We disagree. The Commission found that while both parties expected low growth of future customers in the annexed areas over the ten-year compensation period, both parties expected some growth in future customers. Specifically, Lake Country projected 17 new customers, while the City estimated "generously" that one or two new customers per year could move into the annexed areas, or as many as 20 customers over the ten-year compensation period.

Here, the parties projected growth of 17–20 future customers in the annexed area during the ten-year compensation period. Thus, substantial evidence exists in the record that supports the Commission's order requiring the City to compensate Lake Country for future customers.

### 3. Avoided Costs

The City argues that the Commission erred by determining that avoided costs should be calculated incrementally, which involves calculating the costs a utility will avoid if it loses particular customers in the annexed area. The City argues that avoided costs should be calculated on an allocated basis, which involves calculating the costs of supplying electricity to the utility's general body of rate-payers and allocating those costs to different classes of customers.

The Commission disagreed. It reasoned:

Allocating costs among classes of customers who are actually on a utility's system, contributing to the system's fixed costs through their monthly bills, is fundamentally different from determining what costs a utility will avoid—that is, will stop incurring—if it loses particular customers. In the first case, costs are properly allocated to ensure that active customers bear their fair share of fixed costs. In the second case, costs must be calculated incrementally, since not all the fixed costs allocated to particular customers will go away with the departing customers. Instead, the fixed costs formerly borne by the departing customers must be spread over those remaining on the utility's system.

The Commission's reasoning is both sound and supported by the record.

The City further argues that the Commission ignored its own precedent. "An agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Peoples Natural Gas Co. v. Minn. Pub. Util. Comm'n*, 342 N.W.2d 348, 353 (Minn. App.1983), *review denied* (Minn. Apr. 24, 1984). But "an agency decision may be upheld where each witness testified that a different calculation was reasonable, even though no witness gave testimony supporting the figure chosen by the Commission." *In re Petition of N. States Power Gas Utility*, 519 N.W.2d 921, 926 (Minn.App. 1994).

Here, the Commission referenced a prior annexation case [3] in which it adopted the "incremental avoided costs" approach, and stated there was "nothing in this rec-

ord demonstrating that this established practice should be rethought and overturned." *See Peoples Natural Gas*, 342 N.W.2d at 353 (requiring conformance to prior norms and decisions). Quoting the prior annexation case, the Commission stated

> since the North Park case in 1990,[4] the Commission has consistently used the incremental approach to calculate the displaced utility's avoided expenses and avoided capital investments. Acquiring utilities have often argued in favor of an averaging/allocation approach ..., but after careful deliberation the Commission has consistently found that the incremental approach offers greater accuracy due to its tight focus on the specific situation of the displaced utility.

On this record, the Commission's decision to calculate avoided costs incrementally instead of on an allocated basis is reasonably supported in the record and not arbitrary or capricious.

The City also argues that the Commission erred in its determination of avoided purchased-power costs. Minn.Stat. § 216B.44 provides in relevant part that the Commission, in determining an appropriate compensation award, "shall consider ... loss of revenue to the utility formerly serving the area...." Both parties agree that the Commission must project the "net revenue loss." A major expense to be deducted in arriving at net-revenue loss is the cost a utility incurs to purchase power. In this case it is called "avoided purchased-power costs" because as a result of the acquisition, Lake Country will avoid

---

3. *See In re Application of the City of Buffalo*, A05–1410, 2006 WL 1229596 (Minn.App. May 9, 2006), *review denied* (Minn. July 19, 2006).

4. *In re Annexation of a Portion of the Serv. Territory of People's Coop. Power Ass'n (North Park Additions)*, 470 N.W.2d 525, 529 (Minn. App.1991) (holding that "any appropriate consideration of revenue losses will look to future expectations, not past revenues only"), *review denied* (Minn. July 24, 1991). During the administrative phase of North Park, the Commission adopted the incremental cost approach for calculation of avoided purchased power costs.

that purchased-power cost for customers in the annexed area.

■ Both parties presented expert testimony. The City's expert relied on a 2000 rate study, which identified all costs of supplying electricity to Lake Country's general body of rate payers and allocated those costs to different classes of customers. The City's expert estimated the avoided purchased-power cost would be $91,897 per year or 61 mills/kWh. The Commission rejected the City's estimate on the basis that it included costs that are not avoidable by Lake Country such as the rate structure of a wholesale supplier that artificially inflates purchased-power costs. The Commission rejected use of the 2000 study as it allocates total system costs instead of "determining the direct, incremental costs of losing service rights to annexed areas, and it counts as ongoing at least three significant costs that [Lake Country] no longer incurs."

Lake Country's expert estimated the avoided purchased-power cost would be $69,104 per year or 45.9 mills/kWh. The Commission rejected this estimate as well on the basis that it assumed an inflated load factor[5] for the customers in the annexed areas, which artificially reduces the average cost of purchased power.

The Commission observed that at the hearing, Lake Country's expert admitted that several large, high-load-factor industrial customers may have inflated the average and, therefore, reduced the avoided purchased-power cost. The expert testified, "It might be higher than 45[mills/kWh], but it's probably not higher than 48, let's say, or 50. It's certainly not up in the 60s." The Commission, weighing all the factors, concluded that the purchased-power component is $76,770 per year or 51 mills/kWh.

Because the data to determine the load factor did not exist, and Lake Country assumed a system-average-load factor, the Commission was required to independently examine the record and determine an appropriate load factor. Weighing all of the factors and adjusting for the load factor, the Commission arrived at a mill rate of 51 mills/kWh or $76,770 per year. This mill rate, the Commission stated, was within the "reasonableness" range identified by Lake Country, and it approximated the City's proposed rate, adjusted for some anomalies within its calculation data. On this record, the Commission adequately explained how it derived its conclusion, and that conclusion was reasonable on the basis of the record. *See N. States Power Co.*, 416 N.W.2d at 724 (requiring the agency to adequately explain how it derived its conclusion).

### 4. Other Avoided Costs

■ The Commission also concluded that avoided costs should not include costs that the cooperative is no longer incurring. The Commission found that the 2000 rate study proposed to be used by the City includes at least three significant costs the cooperative no longer incurs. Those costs are a one-time special assessment of $600,000 from Great River Energy (GRE), the generation and transmission cooperative from which Lake Country purchases wholesale power; a $178,000 non-recurring surcharge from GRE; and $1,660,000 in substation charges Lake Country no longer incurs because it has purchased the substation. The Commission concluded that these costs "are not being avoided by transferring service responsibility to the City, and they should not be included in avoided costs." The City argues that these costs should be included to offset

---

**5.** The term "load factor" expresses the relationship between the amount of electricity consumed at times of peak usage on the system and total amount used.

Lake Country's rate increases since 2000, but we defer to the agency's expertise in determining what the relevant costs are to include in such a calculation. *Blue Cross & Blue Shield,* 624 N.W.2d at 278.

Further, the City argues that the Commission should have included approximately $51,220 in avoided system-improvement costs associated with operation and maintenance because Lake Country could use its existing capacity to serve other customers that it no longer needed to provide to the annexed areas. The Commission found that the record did not support including costs associated with allocated system improvements or upgrades in avoided costs because there was no evidence that Lake Country's freed-up capacity could be used elsewhere in its system and there was no support for the City's $51,220 figure. The record also indicates that Lake Country had no plans to construct system improvements within the compensation period. Therefore, substantial evidence in the record supports the Commission's decision not to include system improvements in its avoided-costs calculation.

## II.

The City argues that the Commission's decision was unreasonable in awarding the "largest service territory award in Minnesota history," and thus violated the City's right to due process under the United States and Minnesota constitutions. On review, this court may reverse an agency's decision if it violates a constitutional provision. Minn.Stat. § 14.69. We employ a de novo standard of review when interpreting the federal and state constitutions. *See State v. Shattuck,* 704 N.W.2d 131, 135 (Minn.2005) (federal); *Olson v. Synergistic Tech. Bus. Sys., Inc.* 628 N.W.2d 142, 148 (Minn.2001) (state).

Minn.Stat. § 216B.44 requires that in a contested case regarding compensation for annexed service territory by a municipal utility, the Commission must determine the "appropriate value" of compensation. The City claims that because a past Commission compensation order stated that a compensation award must be reasonable, an "unreasonable" award must violate due process. By analogy, the City argues the United States Supreme Court decision in *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 426, 123 S.Ct. 1513, 1524, 155 L.Ed.2d 585 (2003), holding that excessive punitive damage awards violate the Due Process Clause of the Fourteenth Amendment, protects it against "unreasonable" compensation awards by the Commission. But it is not at all clear that municipal corporations, unlike individuals or private corporations, are "persons" that have standing to assert constitutional due process rights. *See, e.g., City of Sault Ste. Marie v. Andrus,* 532 F.Supp. 157, 168 (D.C.Cir.1980) (holding that a city is not a "person" within the meaning of the Due Process Clause of the Fifth Amendment). Because we hold that the Commission's award was not arbitrary and capricious and is supported by substantial evidence in the record, we need not reach the City's constitutional claim on the merits. *See State v. Hoyt,* 304 N.W.2d 884, 888 (Minn. 1981) (holding that courts do not decide constitutional questions except when necessary to dispose of a case).

## DECISION

Because we conclude that the decision of the Commission is supported by the record and is not arbitrary and capricious or unconstitutional, we affirm.

**Affirmed.**