**In the Matter of the REVIEW OF the 2005 ANNUAL AUTOMATIC ADJUSTMENT OF CHARGES FOR ALL ELECTRIC AND GAS UTILITIES.**

No. A07–0653.

Court of Appeals of Minnesota.

May 6, 2008.

Eric F. Swanson, David M. Aafedt, Winthrop & Weinstine, P.A., Minneapolis, MN, for relator CenterPoint Energy Minnesota Gas.

Lori Swanson, Attorney General, Kari Valley Zipko, Assistant Attorney General, St. Paul, MN, for respondent Minnesota Public Utilities Commission.

Lori Swanson, Attorney General, Steven H. Alpert, Ronald M. Giteck, Assistant Attorneys General, St. Paul, MN, for respondent Minnesota Office of the Attorney General Residential and Small Business Utilities Division.

Considered and decided by JOHNSON, Presiding Judge; MINGE, Judge; and COLLINS, Judge.*

## OPINION

JOHNSON, Judge.

Due to inadvertence, CenterPoint Energy Minnesota Gas failed to properly account for approximately $28 million in purchases of natural gas that was delivered to Minnesota customers over a five-year period. Although CenterPoint is permitted to

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

recover its gas costs from consumers on a dollar-for-dollar, pass-through basis, CenterPoint did not recover that portion of its gas-acquisition costs during the five-year period because of its accounting errors. The Minnesota Public Utilities Commission generally permits a utility to recover pass-through costs for only the most recent prior year. CenterPoint requested a variance from that one-year limitation. The commission denied the request, thus denying CenterPoint recovery of approximately $21 million in gas-acquisition costs incurred in four earlier prior years.

CenterPoint argues that the commission's decision was inconsistent with the commission's decisions in response to prior, similar requests for variances. We conclude that the commission's decision was arbitrary and capricious because the commission neither applied the principles it had applied in its prior decisions nor announced new principles concerning variances. Therefore, we reverse and remand to the commission for further proceedings.

## FACTS

### A. Regulatory Framework

CenterPoint provides natural gas to consumers in Minnesota. As is true with other providers of natural gas, CenterPoint is regulated by the Minnesota Public Utilities Commission. The commission is responsible for setting the rates that a utility may charge its customers for natural gas. Minn.Stat. § 216B.23, subd. 1 (2006). The commission does so through procedures set forth in Minn. R. 7825.3100–.3700 (2005). Natural gas utilities are permitted to "adjust rates to reflect changes in the cost of energy delivered to customers from those costs authorized by the commission in the utility's most recent general rate case." Minn. R. 7825.2390 (2005) (citing Minn. R. 7825.2390–.2920).

To that end, gas utilities must submit monthly reports to the commission summarizing the utility's adjustments for that month. Minn. R. 7825.2910, subp. 1 (2005).

The commission's administrative rules also provide for a so-called "true-up" procedure by which a utility reconciles its costs and its recovery of costs for the previous year. The utility does so by filing an "annual automatic adjustment of charges" (AAA) with the commission. Minn. R. 7825.2810, subp. 1, .2910, subp. 4 (2005). This procedure allows a utility to recover (or requires it to refund) the difference between the revenue it has received from consumers and the cost of the gas supplied to those consumers during the previous year. Minn. R. 7825.2700, subp. 7 (2005). These rules were promulgated by the commission pursuant to its rulemaking authority under the statutory purchased-gas-adjustment (PGA) scheme, which allows CenterPoint and other public utilities to recover the cost of natural gas on a pass-through basis. *See* Minn.Stat. § 216B.16, subp. 7 (2006). Significantly for this case, the true-up process applies only with respect to the prior year. Minn. R. 7825.2700, subp. 7.

The commission also has adopted an administrative rule that allows a utility to request a variance from its regulations. The variance rule requires the commission to grant a variance whenever enforcement of another rule would excessively burden the utility and when the variance would not adversely affect the public interest or violate law. Minn. R. 7829.3200 (2005). The commission may consider the matter in an informal proceeding based on written submissions and an oral presentation before the commission, or the commission may refer the matter to the Minnesota Office of Administrative Hearings for a

contested-case proceeding. Minn. R. 7829.1000, .1200, subps. 1, 2 (2005).

## B. CenterPoint's Request for Variance

After filing its AAA in September 2005, CenterPoint informed the commission in January 2006 that its internal accounting processes had overstated sales of natural gas between 2000 and 2005. CenterPoint misstated sales in two ways; it mistakenly recognized sales for gas that was lost, and it mistakenly recognized unbilled sales (i.e., sales that were to be billed to customers in the future). Because CenterPoint allocates its gas costs proportionately to all its sales, and because a portion of Center-Point's gas costs was allocated to quantities of natural gas that were not actually delivered to customers, CenterPoint missed the opportunity to recover the portion of its gas costs that had been allocated to the overstated amount of gas, which in fact never was delivered to consumers. Approximately 80% of the revenue Center-Point receives from consumers is attributable to the costs incurred in obtaining natural gas from suppliers.

In April 2006, CenterPoint followed up on its earlier notice by filing a request for a variance from the one-year limitation in the true-up rule. In that filing, Center-Point stated that, in any given month, the amount of unbilled sales was "not sufficiently large to stand out and call for further analysis" but that the accumulated total of unbilled sales grew over time, eventually garnering attention after CenterPoint filed its September 2005 AAA filing. In October 2006, CenterPoint filed supplemental comments in which the company stated that the total unrecovered amount for the years 2000 through 2005 was approximately $28 million, of which approximately $21 million was unrecovered between 2000 and 2004.

In an order dated December 6, 2006, the commission denied CenterPoint's request for a variance, reasoning that CenterPoint had not met the requirements for a variance in rule 7829.3200, subp. 1. The commission also ordered an independent audit to review CenterPoint's accounting procedures and denied CenterPoint's request for a contested-case hearing pending the results of the independent audit report.

CenterPoint moved for rehearing and reconsideration. In February 2007, the commission held an open meeting to consider the motion. One commissioner moved to reconsider the earlier decision and to grant a one-year variance, which would allow CenterPoint to recover costs incurred in the 2003–2004 period as well as the 2004–2005 period. The motion failed on a 2–2 vote.

On February 22, 2007, the commission issued an order denying reconsideration and clarifying its December 6, 2006, order. The clarifying order confirmed that the total amount of unrecovered costs is $21 million before taxes, and it affirmed the commission's rationale for denying the variance. CenterPoint now seeks review of the commission's denial of its request for a variance.

## ISSUE

■ Did the public utilities commission act arbitrarily and capriciously by denying CenterPoint's request for a variance in light of the commission's prior decisions concerning variances?

## ANALYSIS

■ When the court of appeals reviews the decision of an administrative agency, it seeks to determine whether the agency's decision is:

(a) in violation of constitutional provisions; or

(b) in excess of the statutory authority or jurisdiction of the agency; or

(c) made upon unlawful procedure; or

(d) affected by other error of law; or

(e) unsupported by substantial evidence in view of the entire record as submitted; or

(f) arbitrary or capricious.

Minn.Stat. § 14.69 (2006). An agency's ruling is arbitrary and capricious if the agency

(a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.

*Citizens Advocating Responsible Devel. v. Kandiyohi County Bd. of Comm'rs*, 713 N.W.2d 817, 832 (Minn.2006). "Decisions of administrative agencies are presumed to be correct" and will be shown deference by reviewing courts where an agency exercises "expertise and special knowledge in the field of its technical training, education and experience." *In re Petition of N. States Power Gas Util.*, 519 N.W.2d 921, 923–24 (Minn.App.1994).

## A. Variance Rule

According to its own administrative rule, the commission may grant a variance to the one-year limitation in the true-up rule. The variance rule provides:

The commission shall grant a variance to its rules when it determines that the following requirements are met:

A. enforcement of the rule would impose an excessive burden upon the applicant or others affected by the rule;

B. granting the variance would not adversely affect the public interest; and

C. granting the variance would not conflict with standards imposed by law.

Minn. R. 7829.3200 (2005).

The parties have brought to our attention two prior administrative cases in which the commission applied the variance rule to the one-year limitation in the true-up rule. In the commission's 1994 AAA docket, the commission granted a one-year variance to Northern States Power Company (NSP) that allowed NSP to recover $1.05 million in unrecovered gas costs. In re Review of 1994 Automatic Adjustment of Charges for All Gas & Elec. Utils., MPUC Docket No. G, E–999/AA–94–762, 1995 Minn. PUC LEXIS 66 at *14–15 (July 13, 1995) (*NSP*). Northern States Power had erroneously continued to apply outdated billing practices for one year after an "internal reporting change." *Id.* at *8–9. The commission characterized NSP's mistake as an "accounting error." *Id.* at *8. In granting the variance, the commission noted that $1.05 million was nearly 10% of the return on equity allowed in NSP's most recent rate case, which the commission found to be an excessive burden. *Id.* at *14. The commission also found that the variance would not be adverse to the public interest because "if the entire time period covered in this matter is considered, no harm has befallen ratepayers." Although acknowledging ratepayer mismatch (i.e., the difference between the group of consumers who used the gas and the group of consumers from whom the utility would recover the previously unrecovered costs), the commission found that the mismatch did not outweigh the benefits of allowing full cost recovery. *Id.* With respect to the third requirement, the commission simply stated that "the vari-

ance would not conflict with standards imposed by law." *Id.*

Similarly, in ruling on disputed issues related to the commission's 1997 AAA docket, the commission granted a two-year variance to Interstate Power Company to recover $164,781 in gas storage costs that the company had failed to record and, therefore, had failed to recover. In re Review of 1997 Annual Automatic Adjustment of Charges for All Gas & Elec. Utils., MPUC Docket No. G, E–999/AA–97–1212, 1998 Minn. PUC LEXIS 66 at *8–10 (May 28, 1998) (*Interstate* ). Applying the reasoning from *NSP*, the commission found that the amount in question imposed an excessive burden. The commission stated, "the $164,781 adjustment is significant and could adversely affect the Company if it is not allowed to recover the expense." *Id.* at *9. The commission did not elaborate on how it calculated the economic impact. Under the public interest analysis, the commission analogized the case to *NSP*, stating, "As in a similar case involving NSP–Gas, the utility's error was inadvertent and the net impact upon ratepayers was zero." *Id.* (footnote omitted). With respect to the third requirement, the commission simply stated, "allowing the requested recovery does not violate any standard imposed by law." *Id.* at *10.

## B. CenterPoint's Request for Variance

The commission's denial of CenterPoint's request for a variance is expressed in its written rulings of December 6, 2006, and February 22, 2007. The commission first found that CenterPoint had not satisfied the first requirement of the variance rule, that "enforcement of the rule would impose an excessive burden upon [CenterPoint] or others affected by the rule." Minn. R. 7829.3200, subp. 1(A). The commission cited CenterPoint's explanation that, on a monthly basis, the unbilled sales

amounts were "insignificant" and "not sufficiently large to stand out and call for further analysis." The commission further reasoned that CenterPoint had "improperly compare[d] four years of errors to one year of operating income," which it deemed "an inappropriate comparison," and that CenterPoint had failed to recover only 0.5% of its gas costs. The commission initially noted that CenterPoint's accounting error had an impact of $2.4 million, which the commission found was only 1.6% of CenterPoint's annual net income, but the commission corrected that figure in its second order by stating that "the cumulative impact of the Company's errors appears to be approximately $21 million before taxes."

The commission also found that CenterPoint had not satisfied the second requirement of the variance rule, that "granting the variance would not adversely affect the public interest." Minn. R. 7829.3200, subp. 1(B). The commission identified three reasons for this conclusion. First, the commission relied on its interest in intergenerational equity among ratepayers (i.e., the concept that prices charged to consumers of natural gas are based on the gas costs actually incurred by the utility at the time the consumer uses the gas), which the commission stated was more important than the financial burden borne by CenterPoint. Second, the commission reasoned that the public interest is served by utilities being compensated for gas costs, and there was no evidence that CenterPoint had not already been "fully compensated." Third, the commission explained that a variance would eliminate an incentive for the company to ensure accurate accounting of its costs because CenterPoint's failure to recover all its costs was due to an error within its control. In its second order, the commission added that "the Company's accounting errors occurred every month for a five-year period, and were due to Com-

pany-initiated changes to its accounting practices."

Finally, the commission apparently found that CenterPoint had not satisfied the third requirement of the variance rule, that "granting the variance would not conflict with standards imposed by law." Minn. R. 7829.3200, subp. 1(C). The commission stated that it "finds inadequate support for the Company's position in the legal analysis offered to justify its request for a variance." In its second order, the commission stated that the 1994 and 1997 cases "do not provide the requisite support to compel such action." The commission noted, "Variances are always fact-intensive and situation-specific. . . ."

## C. Review of Commission's Decision

■ The law that applies to this case has its roots in federal administrative law. *Peoples Natural Gas Co. v. Minnesota Pub. Utils. Comm'n,* 342 N.W.2d 348, 352–53 (Minn.App.1983) (citing decisions of federal circuit courts), *review denied* (Minn. Apr. 24, 1984). Under that body of law, an agency that issues written, reasoned decisions that are recognized as precedent is, nonetheless, not absolutely bound by its own precedent; but such an agency "must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Id.* at 353 (quotation omitted) (citing *Hatch v. Federal Energy Regulatory Comm'n,* 654 F.2d 825, 834 (D.C.Cir.1981); *New Castle County Airport Comm'n v. Civil Aeronautics Bd.,* 371 F.2d 733, 735 (D.C.Cir.1966)); *In re Application of Grand Rapids Pub. Utils. Comm'n,* 731 N.W.2d 866, 873 (Minn.App.2007) (reviewing action of Minnesota Public Utilities Commission); *see also* Richard J. Pierce, Jr., *Administrative Law Treatise* § 11.5, at 819–21 (2002) (discussing "agency adjudication contexts" of varying degrees of formality).

An agency may distinguish its precedent in any given case, provided that it does so "forthrightly" so that courts and applicants may expect consistency in agency actions. *Hatch,* 654 F.2d at 834–35. But "agencies act arbitrarily and capriciously when they ignore their own relevant precedent" by failing to apply or modify the principles articulated in prior decisions. *National Fed'n of Fed. Employees v. Federal Labor Relations Auth.,* 412 F.3d 119, 121 (D.C.Cir.2005) (quotation omitted).

■ When "faced with new developments or in light of reconsideration of the relevant facts and its mandate, [an agency] may alter its past interpretation and overturn past administrative rulings and practice." *American Trucking Ass'n. v. Atchison, Topeka & Santa Fe Ry.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967); *see also National Cable & Telecomm. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 981, 125 S.Ct. 2688, 2699–2700, 162 L.Ed.2d 820 (2005). When, however, an agency modifies the principles that guide it with respect to a particular issue, the agency has a "duty to explain its departure from prior norms." *Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); *see also Fed'n of Fed. Employees,* 412 F.3d at 121. As the United States Supreme Court has phrased it:

> Though the agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as arbitrary, capricious, or an abuse of discretion within the meaning of the Administrative Procedure Act. . . .

*INS v. Yang,* 519 U.S. 26, 32, 117 S.Ct. 350, 353, 136 L.Ed.2d 288 (1996) (alterations and quotations omitted). As stated above, this court previously has adopted the federal approach to this specific area of administrative law. *See Application of Grand Rapids Pub. Utils. Comm'n,* 731 N.W.2d at 873 (citing *Peoples Natural Gas,* 342 N.W.2d at 353); *Peoples Natural Gas,* 342 N.W.2d at 352–53 (citing federal cases).

The Minnesota Public Utilities Commission is an agency that issues written, reasoned decisions that constitute a body of precedent. Counsel for the commission acknowledged at oral argument that when it considered CenterPoint's request, the commission did not intend to depart from its previous interpretations of the variance rule or from the principles articulated in *NSP* and *Interstate.* Thus, the central question in this appeal is whether the commission consistently applied its prior decisions in *NSP* and *Interstate* when denying CenterPoint's request for a variance. We will review the commission's decision by separately analyzing each of the rule's three requirements.

### 1. Excessive Burden

The first requirement for a variance is that "enforcement of the rule would impose an excessive burden upon the applicant or others affected by the rule." Minn. R. 7829.3200, subp. 1(A).

In considering whether a denial of a variance imposes an excessive financial burden on a company, the obvious starting point is the nominal dollar amount. In *NSP,* the commission reasoned that "[f]ailure to recover over $1 million in gas costs would undoubtedly place a burden upon NSP Gas." 1995 Minn. PUC LEXIS 66 at *13–14. In *Interstate,* the commission simply stated that "the $164,781 adjustment is significant and could adversely affect the Company if it is not allowed to recover the expense." 1998 Minn. PUC LEXIS 66 at *9. Yet in this case, the commission concluded that $21 million in unrecovered costs would not result in an excessive burden. The disparity between the ruling on CenterPoint's request and the two prior rulings is impossible to reconcile in sheer numerical terms.

In considering the issue of excessive burden, it also may be appropriate to consider the amount of unrecovered costs in the context of the financial condition of the particular company applying for a variance. The commission has done so in the past. In one of the two prior relevant cases, the commission compared the unrecovered costs to the company's profitability as stated in terms of return on equity. In *NSP,* the commission reasoned that the $1.05 million in gas costs "would represent almost 10% of the return on equity." 1995 Minn. PUC LEXIS 66 at *13–14. In *Interstate,* the commission apparently did not perceive a need to perform this type of proportional financial analysis.

In this case, however, the commission adopted a measurement of the financial burden that it had not previously applied. The commission measured the burden on CenterPoint by expressing the unrecovered costs as a percentage of total gas costs for the non-recovery period. The commission reasoned that $21 million was not an excessive burden for CenterPoint because that amount was only 0.5% of CenterPoint's total gas costs of $4.2 billion for the period at issue. This mode of reasoning fails to recognize any impact on CenterPoint's profitability due to the unrecovered gas-acquisition costs. CenterPoint passes its gas-acquisition costs on to consumers without any mark-up. Thus, the percentage relationship between CenterPoint's unrecovered gas costs and its

total costs is, as a practical matter, irrelevant to its profitability.

If the commission had analyzed the burden on CenterPoint in terms of its return on equity (and we agree with the commission that such an analysis should be done on a consistent, annualized basis—either with separate year-by-year comparisons or a single comparison over the entire four-year period), the commission would have found that the impact on CenterPoint's profitability was significant. In its petition for rehearing and reconsideration, CenterPoint persuasively pointed out to the commission that the diminution in its profitability for 2004, 2003, and 2002 would be 13.79%, 14.24%, and 15.31%, respectively, if the $21 million is distributed over the entire period in which the accounting error affected the company's recovery of costs. Thus, to deny CenterPoint the opportunity to recover its unrecovered gas costs in those years would have a greater proportional impact on CenterPoint than the 10% diminution in profitability that was found to be excessive in *NSP*.

Thus, the commission's reasoning and conclusion regarding the burden on CenterPoint cannot be reconciled with its decisions in the two prior cases.

### 2. Public Interest

The second requirement for obtaining a variance is that the applicant must show that "granting the variance would not adversely affect the public interest." Minn. R. 7829.3200, subp. 1(B). Each of the three reasons given by the commission with respect to the public interest is problematic.

The commissions first and primary consideration with respect to the second requirement is that its interest in inter-generational equity among ratepayers is greater than the financial burden borne by CenterPoint. The principle of "inter-gen-erational equity" is a legitimate public interest and one that the commission has the expertise to implement. *See N. States Power Gas Util.*, 519 N.W.2d at 924. But the commission has not consistently pursued that goal. In *NSP*, the commission reasoned that "[t]he net effect to ratepayers is $0." 1995 Minn. PUC LEXIS 66 at *14. The commission acknowledged some inequity but concluded that it did not "outweigh the benefit of allowing the Company full gas cost recovery as contemplated under the PGA rules." *Id.* In *Interstate*, the commission employed similar reasoning and concluded that "the variance would not conflict with the public interest ... because there would be no net impact on ratepayers." 1998 Minn. PUC LEXIS 66 at *9. In its orders denying CenterPoint's request for a variance, the commission failed to make any effort to distinguish CenterPoint's request from the two prior requests, which also implicated multiple-year recovery periods.

It is significant that the commission was not faced with an all-or-none decision. At oral argument, the commission's counsel conceded that the commission has the discretion to grant the variance in part for a period of fewer than four years. In fact, in moving to reconsider the initial denial of CenterPoint's request, one commissioner proposed that the commission grant the variance for only one additional year. The commission's decision to deny a variance with respect to the entire time period led to a result that is inconsistent with its decisions in the two prior cases.

The commission erred with respect to its reasoning that CenterPoint already had been "fully compensated," an apparent reference to the proceedings in prior years at which CenterPoint's rates were set. This statement, to the extent it may be deemed a finding, is "unsupported by substantial evidence in view of the entire record as

submitted." Minn.Stat. § 14.69(e). The commission's own staff briefings and the commission's appellate brief acknowledge that rate cases generally are not a means for recovering gas costs pursuant to the true-up rule. In addition, it is clear that the accounting errors that required correction had not been detected when CenterPoint submitted its earlier rate proposals, and it also is clear that those accounting errors had a real impact on the company's earnings. CenterPoint's parent company filed a Form 8–K with the United States Securities and Exchange Commission, stating that the company would be taking a pre-tax charge of $21 million as a result of the commission's denial of a variance. The purpose of CenterPoint's request for a variance was to recover costs that were not considered during prior rate-setting proceedings.

The commission also reasoned that a variance would eliminate an incentive for the company to ensure accurate accounting of its costs, noting that CenterPoint's failure to recover all its gas costs was due to an error within its control. In its second order, the commission buttressed this reasoning by noting that "the Company's accounting errors occurred every month for a five-year period, and were due to Company-initiated changes to its accounting practices." These statements imply that the commission considered the existence and degree of CenterPoint's fault. This type of culpability analysis is not required by the text of the variance rule, and the commission did not employ it in either of the two prior cases. The commission does not explain why CenterPoint is more culpable for its accounting errors than NSP and Interstate were in the two prior cases. The commission characterized NSP's mistake as an "accounting error," 1995 Minn. PUC LEXIS 66 at *8, and Interstate's "error" as an "inadvertent [ ] omi[ssion]," 1998 Minn. PUC LEXIS 66 at *8–9. It

appears that the accounting errors in *NSP* and *Interstate* cases were not meaningfully distinguishable from CenterPoint's accounting error.

Thus, the commission's reasoning and conclusion regarding the public interest cannot be reconciled with its decisions in the prior two cases.

### 3. Consistency with Legal Standards

The third and final requirement for a variance is that "granting the variance would not conflict with standards imposed by law." Minn. R. 7829.3200, subp. 1(C). As noted above, it is unclear whether the commission expressly analyzed the third requirement. The commission made vague statements regarding the "legal analysis offered to justify [CenterPoint's] request for a variance" and whether *NSP* and *Interstate* "provide the requisite support to compel" the commission to grant a variance.

It is unclear whether these statements refer to the third requirement of the variance rule or to the entirety of CenterPoint's legal arguments. It appears most likely that they refer to the ultimate issue whether a variance should be granted. If the statements are interpreted as referring specifically to the third requirement, they are inconsistent with prior cases. In the two prior cases, the commission's decision closely tracked the language of the rule by stating simply that a variance would not conflict with any standards imposed by law. 1995 Minn. PUC LEXIS 66 at *14, 1998 Minn. PUC LEXIS 66 at *10. The statements quoted above appear to ask a different question and fail to consider whether granting a variance would conflict with standards imposed by law. In its arguments to this court, the commission has not identified any other law or legal standard that would be violated by a deci-

sion to grant CenterPoint's request for a variance.

Thus, the commission's reasoning and conclusion regarding the third requirement cannot be reconciled with its decisions in the prior two cases.

### 4. Summary

Because the three requirements of the variance rule are stated in the conjunctive, CenterPoint must satisfy all of them. Minn. R. 7829.3200, subp. 1. If CenterPoint has satisfied all three requirements, the commission "shall grant a variance." *Id.*

For the reasons explained above, we conclude that the commission improperly analyzed each of the three requirements of the variance rule. The commission did not consistently apply the principles that it articulated and applied in the *NSP* and *Interstate* cases. The commission also did not modify those principles or change its interpretation of the variance rule, as permitted by *Peoples Natural Gas.* Thus, the commission's decision denying CenterPoint's request for a variance from the true-up rule was arbitrary and capricious. *See Peoples Natural Gas Co.,* 342 N.W.2d at 352–53; *Hatch,* 654 F.2d at 834–35.

### D. Appellate Remedy

Upon a conclusion that an agency has acted arbitrarily and capriciously, a reviewing court may reverse, modify, or "remand the case for further proceedings." Minn.Stat. § 14.69. In previous cases in which an agency decision was held to be arbitrary and capricious, this court typically has remanded for reconsideration of some type. *See Citizens Advocating Responsible Devel. v. Kandiyohi County Bd. of Comm'rs,* 713 N.W.2d 817, 838 (Minn. 2006) (remanding for "a new EIS determination process in accordance with the standards set forth in this opinion"); *In re Revocation of Family Child Care License*

*of Burke,* 666 N.W.2d 724, 728 (Minn.App. 2003) (remanding "for reconsideration of a lesser sanction consistent with this opinion and with the statutes and rules of" agency); *In re Continental Tel. Co.,* 358 N.W.2d 400, 408 (Minn.App.1984) (remanding to the PUC for appropriate proceedings to determine certain issues), *rev'd in part on other grounds,* 389 N.W.2d 910 (Minn.1986).

We remand this case to the commission for further proceedings. Minn.Stat. § 14.69. The commission shall reconsider CenterPoint's request for a variance in light of this opinion. The commission shall apply the same rule on which CenterPoint's request was based and shall apply the same principles that were applied to the requests for variances in *NSP* and *Interstate. See In re Burke,* 666 N.W.2d at 728; *PG&E Gas Transmission, Nw. Corp. v. Federal Energy Regulatory Comm'n,* 315 F.3d 383, 390 (D.C.Cir.2003) (holding that agency failed to distinguish its precedent and remanding with instructions to "reconsider PG & E's proposal in light of this opinion and Commission precedent").

CenterPoint's request for relief includes a request that we direct the commission to refer the matter to the Minnesota Office of Administrative Hearings for a contested-case proceeding. CenterPoint has not cited a "statute or rule" conferring "a right to a hearing," and it appears that "all significant issues have ... been resolved." Minn. R. 7829.1000 (2005). In the applicable section of its brief, CenterPoint requested a contested-case hearing only for the purpose of showing that it has not been "fully compensated," but we have resolved that issue in favor of CenterPoint. Thus, we decline to require a contested-case hearing or to direct the commission to reconsider whether a contested-case hearing is necessary.

### E. Motion to Supplement Record

After oral argument, CenterPoint moved this court to supplement the appellate record with a copy of the independent audit report addressing CenterPoint's accounting errors, which was issued after oral argument. "The papers filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases." Minn. R. Civ. App. P. 110.01. Appellate courts may make exceptions to this rule "when the evidence is documentary evidence of a conclusive nature (uncontroverted) which supports the result obtained in the lower court." *In re Objections & Defenses to Real Property Taxes for 1980 Assessment*, 335 N.W.2d 717, 718 (Minn.1983). That exception does not apply in this case because the evidence is being offered to reverse, rather than affirm, the agency's decision. CenterPoint makes other arguments in support of its motion, but each is unpersuasive. In light of our disposition on appeal, it is unnecessary for this court to review the substance of the audit report. We assume that CenterPoint will be permitted to present the audit report to the commission on remand. Thus, we deny the motion.

### DECISION

The commission failed to faithfully apply its applicable precedent and did not announce a modification of that precedent when it considered CenterPoint's request for a variance. Thus, the commission's denial of CenterPoint's request for a variance was arbitrary and capricious. We therefore reverse and remand this matter to the commission.

In light of our decision to remand the case for further proceedings, it would be premature to consider CenterPoint's tak-ings or due process claims. *See State v. Hoyt*, 304 N.W.2d 884, 888 (Minn.1981) ("We do not decide constitutional questions except when necessary to do so in order to dispose of the case at bar.").

**Reversed and remanded; motion denied.**