**In the Matter of the Application of the CITY OF REDWOOD FALLS to Extend its Assigned Service Area into the Area Presently Served by Redwood Electric Cooperative.**

No. A07–1957.

Court of Appeals of Minnesota.

Sept. 30, 2008.

Carl S. Wosmek, Kathleen Brennan, McGrann Shea Anderson Carnival Straughn & Lamb, Minneapolis, MN, for relator City of Redwood Falls.

Lori Swanson, Attorney General, Kari Valley Zipko, Assistant Attorney General, St. Paul, MN, for respondent MPUC.

Karen A. Finstad Hammel, Assistant Attorney General, St. Paul, MN, for respondent Minnesota Department of Commerce.

Harold P. Levander, Jr., Felhaber, Larson, Fenlon & Vogt, St. Paul, MN, for respondent Redwood Electric Cooperative.

Considered and decided by
HALBROOKS, Presiding Judge;
KLAPHAKE, Judge; and SCHELLHAS, Judge.

## O P I N I O N

KLAPHAKE, Judge.

Relator City of Redwood Falls (the city) challenges a compensation order issued by respondent Minnesota Public Utilities Commission (the commission). Because we conclude that the commission erred in ordering compensation with respect to relator's wastewater treatment facility, but observe no error in the commission's calculation of compensation due for other, annexed areas, we affirm in part and reverse in part.

## FACTS

This appeal arises from a dispute over the compensation due in relation to a municipal acquisition of utility property under Minn.Stat. § 216B.44 (2006). In 2005, the city filed a petition with the commission seeking a determination of compensation due for a number of recently annexed areas for which the city now wished to become the electric utility provider. Until that time, each of the areas had received electricity from Redwood Electric Cooperative (the cooperative), the primary provider of electricity for unincorporated areas of Redwood County. The city also sought a determination from the commission that the city had the right—without paying compensation—to take over the provision of electricity to its wastewater treatment facility, which is located in a service area acquired by the city from Northern States Power (NSP) in 1998 but which had been receiving services from the cooperative since 1996.

The commission referred the matter to an administrative law judge (ALJ) for a contested case hearing. In written findings of fact, conclusions, and recommended order, the ALJ concluded that: (1) the cooperative was not, as a utility customer, entitled to compensation for loss of wastewater treatment ponds because there was no written service-exception agreement between NSP and the cooperative, but that, to avoid unjust enrichment to the city, compensation should be required for facilities that the cooperative had installed that were compatible with the city's electric facilities; (2) the cooperative was not entitled to compensation for future customers in the Prairie Knoll subdivision, which did not yet have any residents and had been developed by the city at significant expense; and (3) the appropriate rate of compensation for the remaining areas was 21.28 mils per kilowatt hour (kWh) of electricity used.

Both the city and the cooperative filed exceptions to the ALJ's report, although the city's exceptions were "simply to clarify or correct certain findings." The cooperative challenged the ALJ's findings and recommendations with respect to (1) the denial of compensation for the transfer of the wastewater treatment ponds to city power and (2) the calculation of the power cost adjustment component of gross revenues for purposes of determining appropriate compensation.

Following a hearing on the exceptions, the commission rejected both of the challenged recommendations. With respect to the wastewater treatment facility, the commission determined that, although it had

never been reduced to writing, a valid service-exception agreement did exist between NSP and the cooperative, but that the terms of that agreement were unclear. Under these unique circumstances, the commission decided that compensation was appropriate, but that it should be calculated based on a five-year compensation period instead of the ten-year period typically allowed by the commission.

With respect to the power cost adjustment component, the commission determined that the ALJ had improperly used the actual pre-acquisition power cost adjustment—which blended the cost of power that the cooperative purchased from the Western Area Power Administration (WAPA) and the more expensive, supplemental power that it purchased from Great River Energy (GRE). The commission determined that the power cost adjustment should be based only on the higher priced GRE power because that was the power that the cooperative would cease to purchase post-acquisition.

Using the revised power cost adjustment calculation, the commission granted a final compensation award of 29.7 mils per kilowatt hour. On the cooperative's motion for reconsideration, the commission issued a corrective order granting a higher rate of compensation, 32.9 mils per kilowatt hour, for the wastewater treatment facility.

The city appeals.

### ISSUES

1. Did the commission err by determining that the cooperative was entitled to compensation for the loss of the wastewater treatment facility as a customer?

2. Did the commission err by using only the higher, supplemental power cost to calculate gross revenues for the purposes of determining the appropriate rate of compensation?

### ANALYSIS

Pursuant to the Minnesota Public Utilities Act (the MPUA), electric utilities are assigned exclusive service territories and may not serve customers within an area assigned to another utility unless the other utility "consents thereto in writing." Minn.Stat. § 216B.40. Notwithstanding these limitations, however, a utility owned by a municipality that extends its corporate boundaries through annexation or consolidation may coextensively extend its service territory by purchasing the facilities of another utility. Minn.Stat. § 216B.44(a). The municipal utility must compensate the previously assigned utility for "the appropriate value of its properties . . . giving due consideration to revenue from and value of the respective properties." *Id.* § 216B.44(b).

If the two utilities are unable to agree on the value of the properties being transferred, either utility may petition the commission for a determination of appropriate compensation. In making that determination, the commission must consider "the original cost of the property, less depreciation, loss of revenue to the utility formerly serving the area, expenses resulting from integration of facilities, and other appropriate factors." *Id.* Where, as here, the commission departs from the recommendations of an administrative law judge, the commission "must include the reasons for each rejection or modification." Minn. Stat. § 14.62, subd. 1 (2006); *see also Bloomquist v. Comm'r of Natural Res.,* 704 N.W.2d 184, 190 (Minn.App.2005) (explaining that, although not binding on the commission, the ALJ's findings should not be taken "lightly").

In reviewing decisions by the commission, this court "adhere[s] to the funda-

mental concept that decisions of administrative agencies enjoy a presumption of correctness and that deference should therefore be shown by courts to the agency's expertise and its special knowledge in the field." *In re Grand Rapids Pub. Utils. Comm'n,* 731 N.W.2d 866, 870 (Minn.App.2007) (citing *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn. 1977)).

Agency decisions following contested-case hearings are reviewed under the Administrative Procedure Act, which provides that such decisions may be reversed or modified if

> the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
>
> (a) in violation of constitutional provisions; or
>
> (b) in excess of the statutory authority or jurisdiction of the agency; or
>
> (c) made upon unlawful procedure; or
>
> (d) affected by other error of law; or
>
> (e) unsupported by substantial evidence in view of the entire record as submitted; or
>
> (f) arbitrary or capricious.

Minn.Stat. § 14.69 (2006).

## I.

■ The city challenges the commission's determination that the cooperative is entitled to compensation for the loss of the city's wastewater treatment facility as a customer. The treatment facility was constructed in 1996 to provide additional capacity for the city's sewer system in anticipation of a consolidation with North Redwood Falls, which was completed in 1997. The city purchased power for the facility from the cooperative beginning in 1996. At the time of their construction, the facility was within the service territory

assigned to NSP, which did not object to the cooperative providing services. In 1998, following consolidation with North Redwood Falls, the city acquired service territory from NSP encompassing North Redwood Falls and the treatment facility. But it was not until 2005, during the negotiations leading up to these proceedings, that the city realized that the treatment facility was within the service area acquired from NSP in 1998.

The commission concluded that the cooperative was entitled to compensation by virtue of a service-exception agreement between NSP and the cooperative, which the commission concluded remained effective following the 1998 service-area transfer, reasoning that NSP could not convey service rights that it did not hold at the time. The commission further concluded that the service-exception agreement between the cooperative and NSP was effective, even though it was never reduced to writing as required by Minn.Stat. § 216B.40. We disagree.

■ This court is not bound by the commission's interpretation of statutes, including the MPUA. *In re Annexation of Serv. Territory of People's Co-op. Power Ass'n,* 470 N.W.2d 525, 527 (Minn.App. 1991). Deference may be appropriate, however, when "(1) the statutory language is technical in nature, and (2) the agency's interpretation is one of longstanding application." *Id.* In this case, the statutory language at issue "is not technical, but is phrased in common terms," and thus we need not defer to the commission's interpretation. *Klatte v. Elm Creek Golf Course, Inc.,* 372 N.W.2d 54, 56 (Minn. App.1985); *see also Twin Ports Convalescent, Inc. v. Minn. State Bd. of Health,* 257 N.W.2d 343, 348 (Minn.1977) ("even longstanding administrative procedures are not binding if erroneous or contrary to plain meaning").

The plain language of the MPUA prohibits a utility from providing service in a territory assigned to another utility unless the assigned utility "consents thereto in writing." Minn.Stat. § 216B.40. Absent such written consent, the right to provide services is governed by the assigned service areas, as established and modified by the commission. *See* Minn.Stat. § 216B.39, subds. 2–3 (2006). It is undisputed that the treatment facility is within a service area that the commission transferred from NSP to the city in 1998. And no party has produced a written exception to that service-area assignment. Under these circumstances, we conclude that the commission erred by ordering the city to compensate the cooperative for the discontinuation of electric service to the treatment facility.

The commission asserts that, while the MPUA requires consent to service exceptions to be in writing, there is no penalty specified for noncompliance and thus that oral service-exception agreements can be effective. Again, we disagree. The statute specifically conditions a utility's ability to provide services in another utility's service area on the other utility's written consent. Thus, this is not a case in which a statute imposes a requirement without specifying consequences for noncompliance. *Cf., e.g., Hans Hagen Homes, Inc. v. City of Minnetrista,* 728 N.W.2d 536, 541 (Minn.2007) (holding that city's failure to provide written reasons for denial of rezoning application within statutory deadline did not invalidate denial of application because statute did not specify penalty for noncompliance).

Although our decision here is controlled by the plain language of the statute, we note that the requirement of written consent is consistent with the MPUA's overriding purpose of providing "coordinated statewide electric service." Minn.Stat.

§ 216B.40. In support of this purpose, the MPUA requires the commission to establish and maintain assigned service area maps, which are to be modified only after notice and hearing. Minn.Stat. § 216B.39, subd. 3. And there are limited enumerated circumstances under which the utilities are permitted to provide services outside their assigned service areas. *See* Minn. Stat. § 216B.40, .42, .421 (2006) (identifying four exceptions, including written consent); *see also In re Petition by Rochester for Order Establishing Rights to Provide Electric Serv.,* 478 N.W.2d 329, 331 (Minn. App.1991) (explaining that, given purposes of the MPUA, this court must "closely examine any alleged exceptions to exclusive service territory rights"), *review denied* (Minn. Jan. 30, 1992). Each of these statutory procedures promotes certainty and, accordingly, the "coordinated statewide electric service" envisioned by the legislature.

As the facts in this case illustrate, permitting utilities to make undocumented adjustments to assigned service areas introduces uncertainty, thereby thwarting statutory objectives. The cooperative offered testimony that NSP had not objected to the cooperative initiating services to the facility in 1998, but was unable to provide evidence regarding the terms of the alleged service-exception agreement. Thus, the commission was left to guess at the intended length of the agreement. Moreover, while the commission apparently found a long-term assignment of rights, the record is equally consistent with a scenario in which NSP and/or the city intended the cooperative to provide power on an at-will basis. Effectively, then, the commission took it upon itself to fill in missing—or at least unwritten—terms of the alleged service-exception agreement. The course taken in these proceedings is not consistent with the statutory scheme

requiring clearly delineated—and documented—service areas.

For these reasons, we conclude that the commission erred by giving effect to the alleged oral service-exception agreement between the cooperative and NSP. Accordingly, we reverse the portion of the commission's order granting compensation with respect to the facility.

## II.

■ The city also challenges the calculation used by the commission to determine appropriate compensation. The MPUA does not provide a formula for determining appropriate compensation following municipal acquisition. The commission has adopted a "net-revenue-loss" formula, which

(1) determines gross revenues for each year of the compensation period, which the commission has set at ten years, to reflect the intermediate planning period of most utilities;

(2) determines avoided costs that the utility would no longer be required to incur because it is no longer serving the area (such costs would include the purchase of power to be sold within the area);

(3) subtracts the avoided cost from the gross revenues, which results in yearly net-revenue loss for each year in the ten-year compensation period; and

(4) reduces net revenue losses to present value.

Due to uncertainty of future events, the lump-sum amount calculated under this method is often converted into a kilowatt-per-hour rate, or mill rate, and payment is made at this mill rate over the compensation period.

*In re Grand Rapids Pub. Utilities Comm'n,* 731 N.W.2d at 869. This court recently held that this formula "is an appropriate method for [the commission] to calculate a displaced utility's lost revenues under Minn.Stat. § 216B.44." *Id.* at 872.

Here, the city's challenge is not to the formula itself, but with the commission's determination of gross revenues under step one of the formula. The city argues that the commission inappropriately determined the power cost adjustment—which reflects a pass—through surcharge to customers based on the fluctuating cost of power-based only on higher-priced, supplemental power purchased by the cooperative. The city asserts that use of a higher number is inappropriate because the power cost adjustment charged to individual cooperative customers should actually decrease following acquisition. In other words, the city objects that the commission's power cost adjustment overstates gross revenues by failing to take into account the savings from smaller purchases of the higher-priced GRE power.

But the commission determined that the proper calculation focused not on the impact to individual customers, but on the overall impact to cooperative revenues. While acknowledging that blending the two rates was "appropriate from a rate-making perspective," the commission reasoned that the power cost adjustment used to determine compensation should reflect "how the loss of actual customers ... will actually affect [the cooperative's] power costs." The commission further determined that use of a power cost adjustment based on GRE power costs was appropriate because the cooperative had purchased supplemental GRE power to meet the cumulative demands of its pre-acquisition customers, including those in the annexed areas, and would cease purchasing only GRE power post-acquisition. The commission further determined that the avoided cost of the higher-priced GRE power was properly taken into account not in step

one (gross revenues), but in step two (avoided costs). The commission concluded that "[f]ailing to reflect these actual costs in calculating the power cost adjustment component of gross revenues nullifies the effect of reflecting them in the avoided cost calculation." The commission's analysis is supported by the substantial evidence and is neither arbitrary nor capricious. Thus, we affirm this portion of the commission's order.

## DECISION

Because the commission erred by giving effect to the alleged oral service-exception agreement, we reverse the commission's compensation order with respect to the treatment facility. Because the commission's calculation of the compensation due for the remaining, annexed areas was supported by the substantial evidence and neither arbitrary nor capricious, we affirm that portion of the commission's order.

**Affirmed in part and reversed in part.**